EVERS, J. T. C.
This matter concerns the issues of valuation and discrimination involving a light industrial building located in the Borough Fort Lee (borough) for the years 1977, 1978 and 1979. Before addressing the evidence adduced in support of each party’s substantive claims, the court must determine whether a discrimination claim is properly before it in light of the unique facts herein.
In 1977 the taxpayer filed an appeal from the Bergen County Tax Board (board) to the Division of Tax Appeals claiming its property was overvalued and that the assessment of the property was discriminatory. The borough filed a cross-appeal praying for a determination of true value. In 1978 both parties filed appeals from a Bergen County Tax Board judgment to the Division of Tax Appeals, praying only for relief based on a determination of true value. In 1979 the taxpayers filed a one-count complaint in the Tax Court, from a Bergen County Tax Board judgment, praying for relief based on a determination of true value. The borough counterclaimed for relief based solely on discrimination. At the pretrial conference the taxpayers abandoned their 1977 discrimination claim.
*76 Despite the apparent absence of a discrimination claim in the 1978 tax year, the taxpayers submitted an appraisal report purportedly seeking the application of N.J.S.A. 54:2-40.4 and N.J.S.A. 54:3-22(c) to (f) (commonly referred to as chapter 123) to taxpayers’ finding of true value. The report concluded that taxpayers were entitled to relief from discrimination. There was no testimony at trial regarding the application of a ratio to the true value of the subject property.
Thus, the issues to be determined revolve around the effect of chapter 123 on the ruling established in Hackensack Water Co. v. North Bergen, 8 N.J.Super. 139, 73 A.2d 597 (App.Div.1950), and Cleff Realty Co. v. Jersey City, 41 N.J.Super. 465, 125 A.2d 423 (App.Div.1956), certif. den. 23 N.J. 58, 125 A.2d 227 (1957) (referred to herein as the rule of Cleff Realty), that in order for a court to determine whether an assessment was discriminatory the cause of action praying for such relief must be pleaded properly.
Hackensack Water concerned a case where the taxpayer never alleged a cause of action based on discrimination at the county board level but sought to amend its Division of Tax Appeals petition on the purported authority of N.J.S.A. 54:2-40.2.[1] The court held:
While the language [in N.J.S.A. 54:2-40.2] employed by the Legislature is most comprehensive, the amendments that may properly be made are not unrestricted. It is a principle of wide application that an amendment setting up a new cause of action should not be permitted after the time has expired for bringing the suit or other proceeding. Russo v. Wright Aeronautical Corporation, 1 N.J. 417 [64 A.2d 71] (1949). ...
The original petition of appeal and the proposed amendment alleged very different wrongs; the first, that appellant’s property was assessed at too high a *77 figure; the second, that other people’s properties were assessed too little. [8 N.J.Super. at 142, 73 A.2d 597],
Cleft Realty refined the rule in a case where a taxpayer again sought leave to amend a Division of Tax Appeals petition as the taxpayer did in Hackensack Water. The court specifically refuted the contention made by the taxpayer that a general prayer for relief that the assessment be increased or deceased according to the true value includes a cause of action based on discrimination. It stated:
Clearly in such cases, under elementary principles of sound pleading, even before administrative agencies, it would be necessary for the appellant to state its particular grievance, and jurisdiction would not vest in either the county or state tax board to grant the relief really intended, upon the basis of a meaningless and irrelevant formal prayer that the assessment of the property be decreased to its true value. [41 N.J.Super. at 469, 125 A.2d 423].
The court concluded that a petition of appeal that merely requested a reduction of the assessment to the true value of the property did not frame an issue as to a discriminatory assessment.
This rule has been followed faithfully. See Matawan v. Tree Haven Apartments, Inc., 108 N.J.Super. 111, 260 A.2d 235 (App.Div.1969); Continental Paper Co. v. Ridgefield Park, 122 N.J.Super. 446, 300 A.2d 850 (App.Div.1973), certif. den. 63 N.J. 328, 307 A.2d 101 (1973), and Anaconda Co. v. Perth Amboy, 157 N.J.Super. 42, 384 A.2d 531 (App.Div.1978), certif. den. 81 N.J. 55, 404 A.2d 1155 (1979).
Simply put, the taxpayer contends that by virtue of chapter 123 a discrimination claim need no longer be pleaded. It argues that chapter 123, by virtue of the statutory scheme, is in every case automatically. In the alternative, it argues that since chapter 123 relief was “requested” through the introduction of its appraisal report into evidence, the court may give relief by virtue of a cause of action based on discrimination.
The borough maintains that the rule of Cleff Realty still controls and, furthermore, that since the pretrial order did not make reference to discrimination, it is not a justiciable issue.
*78 The pertinent statutory provision concerning the revision of the assessed value of the property pursuant to chapter 123 is found in N.J.S.A. 54:2-40.4:[2]
a. Whenever the Tax Court is satisfied by the proofs that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property except as hereinafter provided.
b. If the average ratio is below the county percentage level and the ratio of the assessed value of the subject property to its true value exceeds the county percentage level, the Tax Court shall enter judgment, reducing the taxable value of the property by applying the average ratio to the true value of the property.
c. If both the average ratio and the ratio of the assessed value of the subject property to its true value exceed the county percentage level, the Tax Court shall enter judgment revising the taxable value of the property by applying the county percentage level to the true value of the property.
d. The provisions of this act shall not apply to any proceeding to review an assessment of real property taken with respect to the tax year in which the taxing district shall have completed and put into operation a district-wide revaluation program approved by the Director of Taxation pursuant to Chapter 424, laws of 1971 (C. 54:1-35.35 et seq.), or a reassessment program approved by the county board of taxation.
As was stated in Devonshire Develop. Associates v. Hackensack, 2 N.J.Tax 392 (Tax Court 1981):
Chapter 123 was in large part a legislative response to the problem of proving a discriminatory assessment in cases where Kents relief is sought (In re Appeal of Kents, 34 N.J. 21, 166 A.2d 763 (1961)). The elements of a Kents action were succinctly set forth in Continental Paper Co. v. Ridgefield Park, supra:
In order to make out a case of actionable discrimination, these elements must be proved:
(1) That the real property generally in the municipality was assessed at less than true value; (2) what the common assessment level was and (3) the true value of the subject property upon which the common level percentage would operate.
Reading Company v. Woodbridge Township, 45 N.J. 407, 426 [212 A.2d 649] (1965); Matawan v. Tree Haven Apartments, Inc., supra, 108 N.J.Super. at 116 [260 A.2d 235]; Feder v. Passaic, 105 N.J.Super. 157, 160 [251 A.2d 457] (App.Div.1969). If there was no common level shown and there is none which the assessor is endeavoring to apply, and the assessment is substantially higher than the “average ratio” determined by the Director of the Division of Taxation, the “average ratio” may be applied under Kents, and the assessment reduced by that proportion. Matawan v. Tree Haven Apartments, Inc., supra, *79 108 N.J.Super. at 116 [260 A.2d 235]; Feder v. City of Passaic, supra, 105 N.J.Super. at 116 [251 A.2d 457], [122 N.J.Super. at 450-451, 300 A.2d 850]
Chapter 123 effectively relieves a party from proving the first and second elements in the above equation. In a pre-chapter 123 discrimination action a party labored to prove these elements by extensive statistical studies introduced through experts. See R.M.P. Holding Co. v. Passaic, 1 N.J.Tax 359, 367-371 (Tax Court 1980), and Niktan Realty Co. v. Passaic, 1 N.J.Tax 393, 403-407 (Tax Court 1980). Chapter 123 supplies a bypass as to those elements that have been developed by the courts through the years. [398-99]
It is eminently clear that chapter 123 was indeed a profound alteration of the law of real property tax discrimination. The very title of the original act (L. 1973, c. 123) indicates that the Legislature had enacted:
An Act concerning tax appeals, establishing certain rebuttable presumptions relating to cases of alleged discrimination and amending R.S. 54:3-22 and R.S. 54:4-62 and Sec. 15 of Ch. 161 and the Laws of 1946. [Emphasis supplied]
Furthermore, the committee statement appended to the amendment to chapter 123 (L. 1979, c. 51, that changed the chapter 123 ratio from an unweighted ratio to a weighted ratio for 1979 and following) reiterated that chapter 123 established “a rebuttable presumption relating to tax appeal cases of alleged discrimination.” [Emphasis supplied].
While the statement and title of the act are not controlling, they nevertheless are clear manifestations of the legislative intent that demonstrate chapter 123 is not “present in every case.” Likewise, the statement and title do not detract from the plain meaning of the act and I thus accord significant weight to the Legislature’s choice of words. See, generally, Brewer v. Porch, 53 N.J. 167, 249 A.2d 388 (1969); Morris & Essex Invest. Co. v. Taxation Div. Director, 33 N.J. 24, 161 A.2d 491 (1960), and Keith Machinery Corp. v. South Plainfield, 89 N.J.Super. 584, 215 A.2d 788 (Law.Div.1965), aff’d per curiam 91 N.J.Super. 469, 221 A.2d 47 (App.Div.1966).
This legislative expression is buttressed by the scheme of chapter 123 itself since the remedy therein is not an alternative remedy to the discrimination remedy set forth in the seminal case of In re Appeal of Kents, 34 N.J. 21, 166 A.2d 763 (1961). Chapter 123 relief is not an alternative to the constitutional right to claim discrimination found in Kents, but is an answer to *80 Chief Justice Weintraub’s plea for a legislative response to the dilemma of providing a remedy in “ratio cases.” Kents, 34 N.J. at 33, 166 A.2d 763. [Devonshire, supra, at 403].
In support of the oft-stated proposition that chapter 123 was in large part of legislative response to the problem of proving a discriminatory assessment in cases where Kents relief is sought, Devonshire, supra, at 398; see, also, Tomkins Tidewater Terminal Co. v. Kearny, 1 N.J.Tax 590 (Tax Court 1980), a review of the legislative activities predating its adoption is enlightening.
. Chapter 123 was derived from Senate Bill 82 (1959), which stated in pertinent part:
(b) Where the petition of appeal alleges that the subject property has been assessed at a value in excess of the common level in the taxing district, it shall be presumed, subject to being rebutted by the taxing district, that the common level of assessments of real property is within a range determined by the unweighted average ratio of assessed to true value of real property in the taxing district, plus and minus 15% of such average to be determined by the Division of Taxation... It shall also be presumed, also subject to rebuttal by the taxing district, that discrimination has been established whenever the division is satisfied by the proofs that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit of such common level determined as above provided. Upon the basis of such presumptions, the taxable value of the property may be reduced or increased so that it will fall within the common level so determined.
Two other identical sections were proposed that gave the same relief to taxpayers proceeding at the county tax board level and the Superior Court prerogative writ route.
This bill (Senate Bill 82) never enacted, was a proposed amendment to N.J.S.A. 54:2-40.4 and clearly serves as the source of chapter 123. Yet it significantly differs in that it expressly allowed only a taxing district to rebut the statutory presumption of the common level. However, it unequivocally supports the principle that such relief must be pleaded within the spirit of the Cleff Realty rule and further supports the holding of Devonshire in that an assessment may be decreased or increased according to the applicable chapter 123 ratio.
The Kents opinion stated:
*81 It may be added that our Legislature accepted and specified the average ratio (unweighted) as the level with respect to the assessment of tangible personal property used in business if it should be less than the percentage fixed under the new statute to which we have already referred. L. 1960, e. 51, § 8. We are aware that the Legislature has not yet acted finally upon a bill (S.2) which would use the unweighted average ratio as the central figure in a remedy for unequal taxation of real property. But until some better technique appears or some other suitable one is provided by statute, we are satisfied to utilize the average ratio in cases such as the one before us.[3] [34 N.J. at 33, 166 A.2d 763]
Senate Bill 2 (1960) was the successor to Senate Bill 82 (1959). That bill was essentially identical to Senate Bill 82 but for one profound alteration as to actions at either the Division of Tax Appeals, County Board or Superior Court levels. Section (b) of Senate Bill 2 was the verbatim recitation of Section (b) of Senate Bill 82 and would apply:
(c) Where a petition of appeal with respect to real property alleges that the subject property has been assessed at a value in excess of or below the common level in the taxing district, it shall be presumed, subject to being rebutted by a clear preponderance of evidence to the contrary, that the common level of assessments of real property is within a range determined by the unweighted average ratio of assessed to true value of real property in the taxing district plus and minus 10% of such average.... [Emphasis supplied]
Thus Senate Bill 2 permitted rebuttal by either party, unlike its ancestor Senate Bill 82. Significantly, both bills were sponsored by Senators Crane, Fox and Dumont, and both were entitled, “An Act Concerning Taxation, Establishing Certain Rebuttable Presumptions Relating to Cases of Alleged Discrimination.” Chapter 123 was the long-awaited tool for establishing an objective, statistical gauge for measuring an allegedly discriminatory assessment. It was fashioned from these provisions in order to act as a solvent for the constitutional problem of the inequality of property tax burdens in the State of New Jersey.
It is important to note that the precursors to chapter 123 were either drafted or enacted before the landmark decision of In re Appeal of Kents, supra, which specifically dealt with the level of constitutional relief warranted in a case where there is no *82 semblance of a common level of assessment. Then Chief Justice Weintraub held that the Director’s average ratio (school aid, tax year) was the figure to which the taxpayer’s percentage of assessed true value would be reduced to in a noncommon level case. This critical historical fact is evidenced by the remarks of then Deputy Director of the New Jersey Division of Taxation at the 27th Annual Meeting of the National Association of Tax Administrators, (July 8-11, 1959). Before the Kents case a taxpayer who proved an utter absence of a common level won a Pyrrhic victory since the court had no remedy for the wrong. Senate Bill 82 was originally intended as the statutory remedy to right this wrong, /. e., it supplied a presumptive common level. After Kents it appears the Legislature put the chapter 123 precursor “on the back burner” since the then perceived pressing need evaporated. Nonetheless, then Chief Justice Weintraub expressed the hope that a statutory remedy would be provided in time since it was preferable. Kents 34 N.J. at 33, 166 A.2d 763. The Chief Justice’s wish was fulfilled in 1978 when chapter 123 became effective, but the die was cast in 1959. In all respects the lineage of the statutory remedy was clearly of a common thread and evolved into a streamlined method of proving discrimination cases.
Chapter 123 mandates that the average ratio to be used in actions grounded in discrimination “shall mean” the Director’s school aid ratio (weighted except in 1978), as calculated pursuant to N.J.S.A. 54:1-35.1 for the year preceding the tax year (emphasis supplied). In short, the Legislature fully intended to reverse the principle, never fully explained by the courts, that the tax year school aid ratio shall be used in discrimination cases. It emphatically and mandatorily directed the appropriate tribunal to use the assessment (pre-tax) year school aid ratio as affected by judgments from appeals by taxing districts challenging the school aid ratio pursuant to N.J.S.A. 54:1-35.4. The Legislature has taken this chapter 123 ratio and formulated the “substantially disparate treatment” element of Kents into a common level range or “corridor.”
*83 In terms of proving an action grounded in discrimination after the effective date of chapter 123 it must be emphasized that the Legislature preserved the right of a party at trial to rebut the presumption that the pre-tax year school aid ratio reflects the common level in the taxing district. Thus, without more, the chapter 123 remedy in the first instance will be employed in determining the validity of a discrimination claim.[4]
This aspect of the statute takes on added importance when it is noted that the 1980 chapter 123 ratio which was certified on April 1,1980 is based on a study covering the period July 1, 1978 through June 30, 1979. The 1980 school aid ratio is promulgated on October 1,1980 and is based on a study covering the period July 1, 1979 through June 30, 1980. The use of the ratio based on the more current period may be more probative of assessing practices in a particular taxing district where, for instance, peculiar circumstances have caused rapidly fluctuating property values during the earlier study period. Additionally, it is conceivable that a party could demonstrate that a common level exists, as reflected by the unweighted ratio study for the year in question. In short, the presumption of discrimination in accordance with chapter 123 can be rebutted by a party, either *84 the plaintiff or the defendant, in any manner demonstrating a common level notwithstanding the chapter 123 ratio.
If it were held that chapter 123 is in every case automatically, the court would then simply take judicial notice of the chapter 123 ratio and on its own motion mold the assessment to that ratio. In its ex parte application of the ratio the court would thereby deprive the opposing litigant of the right to rebut such a ratio application if discrimination relief was warranted under chapter 123.[5] The obvious disruption of trial administration would be the only way to ameliorate such cases, as the court would routinely be bound to grant a continuance out of a sense of fundamental fairness.
Based on the foregoing it is clear that chapter 123 has not altered the settled rule of Cleff Realty, since a discrimination action after the effective date of chapter 123 is streamlined primarily with respect to matters concerning the proof of the elements of that cause of action. Nothing in either the act itself or the legislative history indicates that chapter 123 affected the well settled rule of Cleff Realty.
. A more basic reason in support of the viability of the rule of Cleff Realty is found in the jurisdictional statutory provisions controlling the instituting of tax appeals. N.J.S.A. 54:3-21 clearly mandates the filing of an appeal to the county board by the absolute deadline of August 15 and permits the filing of a direct appeal in the Tax Court on the same date if the assessment is greater than $750,000. N.J.S.A. 54:2 — 39 mandates that all appeals from county board judgments must be filed in the Tax Court within 45 days of the service of the county board judgment. Accord R. 8:4-l(a), 2 and 4. The foregoing jurisdictional provisions are very strictly adhered to. Prospect Hill *85 Gardens v. Flemington, 1 N.J.Tax 224, 172 N.J.Super. 245, 411 A.2d 737 (Tax Court 1979); compare Curtiss Wright Corp. v. Wood Ridge, 2 N.J.Tax 143 (1981) where the Tax Court allowed the filing of an untimely counterclaim pursuant to R. 4:7--4 by analogizing the theory of “equitable recoupment.”
If this court were to hold that the plaintiff could inject its discrimination claim under the circumstances herein, it would be circumventing well established legal principles and would therefore be remiss in failing to recognize that parties must be particularly vigilant in complying with tax statutes establishing jurisdictional time limits. See Sun Life Assur. Co. v. Orange, 2 N.J.Tax 25 (Tax Court 1980).
Based on the foregoing, I hold that discrimination claims brought pursuant to chapter 123 still must be properly pleaded, as was the case with respect to pre-chapter 123 actions. The rule of Cleff Realty demands this result, and until it is overruled this court is bound by it.
The subject property consists of an irregularly shaped parcel containing 1.382 acres (approximately 60,000 square feet) and is improved with a one-story masonry structure erected approximately 25 years ago and used for industrial purposes. In addition to the manufacturing portion, the building contains office and warehouse areas. The structure contains approximately 24,000 square feet and was described as being in fair to good condition.
The tract has a street frontage of 302 feet, is served with all the usual utilities and is located in a conforming zone. The immediate area is generally devoted to mixed residential and industrial uses. The site, which is in the immediate vicinity of Mediterranean Towers, a large luxury high-rise apartment building, is in close proximity to Main Street, a large commercial area, and is a short distance from Route 46, a major east-west highway. Both parties agreed that a continuation of the light industrial usage represents its highest and best use.
For the three years in question the property was assessed at $664,400, with $391,300 allocated to the land and $273,100 to the *86 improvement. While the county board affirmed the assessments in 1977 and 1978, in 1979 it reduced the land assessment to $300,000 (based on $5 a square foot) and the total assessment to $573,100. In taxpayer’s opinion, the value of the property was $476,000 with $289,000 devoted to the land and $187,000 to the building. The borough’s expert’s estimate of value was virtually identical to the assessment and he thus accepted those figures as being representative of true value. A revaluation was effective for the 1977 tax year.
Both experts employed the market and income approaches to value, although borough’s expert also utilized the cost method. Primary reliance was placed on the income approach, although the borough’s expert was of the opinion that the August 1975 purchase price of the property for $670,700 also reflected its value. Although the building was owner-occupied, it was not contended that it was a special purpose structure.
I reject the use of taxpayer’s comparable sales approach. I find that the degree of similarity which is necessary for the court to make a reasonable comparison of the sales and subject property was lacking in the four sales testified to by the taxpayer’s witness. All sales properties were located in industrial park type settings, in other taxing districts and were relatively recently constructed. The sales approach is often effective in determining value for property tax purposes but only where there is a substantial similarity between the properties demonstrating reasonable comparison. Newark v. West Milford, 9 N.J. 295, 88 A.2d 211 (1953), and Venino v. Carlstadt, 1 N.J.Tax 172 (1980).
The use of the market approach is further rejected because in these circumstances I find the most persuasive approach to be the income approach to value. The sales prices of like structures means comparatively little to an investor if the property does not provide an adequate return to justify the sales price. Parkview Village Ass’n v. Collingswood, 62 N.J. 21, 297 A.2d 842 (1972). The logical justification for the income approach to value is the
*87 .. .common knowledge that a prospective investor in realty expects a fair return upon any investment he makes, and, before investing, studies the income history of the property and considers its income producing potentiality. [Annotation, “income or rental value as a factor in evaluation of real property for purposes of taxation,” 96 A.L.R.2d 666, 669 (1964)].
With respect to the purchase price of the property itself, I observe that it has long been recognized that such price is a guiding “indicium” of fair market value and ordinarily is merely evidential although under certain circumstances it might become controlling. See Hackensack Water Co. v. Tax Appeals Div., 2 N.J. 157, 162, 65 A.2d 828 (1949). The statutory standard found in N.J.S.A. 54:4-23 is that price which a hypothetical purchaser will pay at a fair and bona fide sale by private contract on October 1 of the pre-tax year. Market value has been defined as the highest price in terms of money that a property would bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably and assuming the price is not affected by undue stimulus. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978), at 23.
Although the 1975 purchase price of the subject property seemingly supports borough’s position, the very convincing and uncontroverted testimony of the taxpayer and taxpayer’s expert clearly demonstrates that the purchase price was inflated as a result of factors extraneous to the value of the property itself. Prior to the acquisition the taxpayer had, since 1963, an established business on this property which business required the use of relatively heavy machinery and equipment. Considerable time and expense, according to taxpayer, were expended in setting up the machinery. Taxpayer estimated the removal cost of each of the six machines would be approximately $28,000-$30,000. In acquiring ownership of the property, taxpayer therefore avoided the cost and inconvenience of uprooting the business and equipment and reestablishing the business elsewhere. The testimony clearly indicated that these factors were major considerations in establishing the sales price. Accordingly, I give no weight to the acquisition price of the property in question.
*88 Taxpayer’s witness attempted to support his opinion of the land value of $289,000 by referring to two alleged comparable sales of vacant land. Sale # 1 contained 25,000 square feet and was sold in June 1974 for $200,000, or $8 a square foot. According to the witness, the consummation of this transaction was contingent upon obtaining a change of zone from industrial to residential. Given the location of the sales parcel it can be reasonably deduced that if a change of zone permitting residential (high-rise, garden apartment, town house, etc.) use were adopted, the tract would command a greater price than would a similarly situated parcel in an industrial zone. Additional factors surrounding the sale parcel, however, offset that argument. The lot was located on an unimproved street and suffered from some severe rock outcroppings and slopes. Secondly, it is noted that the sale occurred more than two years prior to the date of assessment of the first tax year here in question.
Taxpayer’s second sale was of a lot measuring 241' X 100' which was sold in December 1972 for $115,000, or $4.77 a square foot. At the time of the sale the lot was zoned industrial. No sewer was available to this tract, which also suffered from severe topographical problems and serious rock outcroppings. It is noted that the sale was consummated almost four years prior to the 1977 assessment date.
The borough expert referred to no specific vacant land sales but testified that the $391,300 value established by the revaluation firm on October 1, 1976 was consistent with his general knowledge of vacant land‘values in Fort Lee. This value, according to the witness, was based on an average price of $285,000 an acre in the borough. Without more, this testimony was simply too vague and general to be accorded any weight.
Contrary to taxpayer’s argument, the comparable sales actually support the original assessed value, which was based on $6.50 a foot and which in 1977 and 1978 were affirmed by the county board. In fact, these sales give me no reason to disturb the original land assessments in all three years under review. No explanation was given for the reduction granted by the *89 county board in 1979 but it can be readily assumed that either these two sales were not presented to the board or the evidence that was apparently convincing to the board was not offered here. In any event, the record in this de novo hearing clearly supports a finding that $6.50 a foot represents the true value of the land. Accordingly, I find the land value in the three years in question to be $391,300.
In their income approaches to value both experts based their estimates of income on a net lease of property known as 1327 16th Street, which, in terms of use, size, location and environment, was markedly similar to the subject. This five year lease commenced in 1978. For 1978 and 1979 the rent was $2.68 a foot and for the last three years of the term it was $2.95 a foot. On the basis of this lease as well as four leases of alleged comparable properties in other taxing districts, and after making adjustments for time, location, size and other such factors, taxpayer’s expert found the economic rent to be $2.50 a foot. Claiming that the 16th Street premises were inferior to the subject, the borough’s witness estimated the economic rent to be $3 a foot.
As is the case with respect to sales prices, so, too, rents of properties in other taxing districts may be influenced by factors such as tax rates, road network, labor markets and zoning. For the reasons that I rejected the comparable sales I give no weight to the four leases offered by the taxpayer.
The evidence does not support the conclusions of either witness. I find that the 16th Street property consisting of 32,400 square feet, located in an industrial zone, situated in an environment extremely similar to that of the subject and devoted to industrial-office use, is very comparable to the subject property.
In utilizing a lease which became effective subsequent to the first assessing date herein I am mindful of New Brunswick v. Tax Appeals Div., 39 N.J. 537, 189 A.2d 702 (1963), where, in dealing with diminished rentals which occurred after the assessing date, then Chief Justice Weintraub said:
*90 ... valuation, although based upon a forecast of earnings, must be found upon what was known and anticipated as of the assessing date, unaided by hindsight, [at 545,]
I find that this lease was obviously negotiated prior to its effective date. It became effective during the time period in question. This lease took into consideration the natural rise in rents during the period in question which were obviously to be anticipated as of the assessing dates. The lease rent is not the sole indicator of income but it is corroborative of a known fact, i. e., future rent increases, as of the assessing date. Its use is consistent with the reasoning and the approaches utilized by both parties. See In re Erie Railroad System, 19 N.J. 110, 130, 115 A.2d 89 (1955); New Brunswick v. Tax Appeals Div., supra at 545, and Parkview Village Ass’n v. Collingswood, supra, 62 N.J. at 29, 297 A.2d 842. Additionally, it is to be noted that the lease is of relatively short duration and that the record does not even hint that the 16th Street premises was ill-managed. Accordingly, I find the economic rent to be $2.68 a square foot and the gross income to be $64,320.
Both experts allowed a 3% deduction from gross income for vacancies and rent loss. The taxpayer and borough witnesses estimated the operating expenses to range from 6% to 10%, respectively. Considering the nature of the use, the owner occupation of the structure, its interior and exterior construction, I find the deductions allowed by taxpayer to be fair and reasonable. The income available for capitalization therefore is $58,647.
In the capitalization process both experts eschewed the residual technique in favor of applying one capitalization rate to the income composed of return on and return of investment and thus found one total value for both land and building. Taxpayer estimated a fair interest rate at 9.5% while the borough’s witness allowed an 8% return. Based on the record, which indicates that mortgage and alternative investment rates averaged at least 9.5% during the period in question,I agree with taxpayer’s position. With respect to the recapture rate, taxpayer’s witness allowed 2% and the borough’s expert 1.5%. *91 Considering that the land is a nonwasting asset, these rates actually equate to approximately 4% and 3%, respectively. Put another way, the rates assume a remaining economic life for the structure to be 25-33 years. Considering all the circumstances as hereinbefore mentioned, I find the useful life to be 40 years.
It is not only the right but the duty of the court to apply its own expert judgment to valuation data submitted by the experts and to ascertain true value in light of all the evidence. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 73-74, 208 A.2d 153 (App.Div.1965). Accordingly my recapitulation of the capitalization of income approach based on the straight line residual technique follows:
Gross (net lease) income $ 64,320
Deduct vacancy and rent loss (3%) 1.930
Income before expenses $ 62,390
Deduct expenses (6%) 3,743
Income - land and improvement $ 58,647
Income imputable to land ($391,300 x .095) 37,173
Income available to improvement $ 21,474
Improvement income capitalized at 12% (.095 interest - .025 recapture)
Value of improvement $21,474 .12) $ 171,792
Value of land 391,300
Total value $ 563,092
Remaining for consideration is the borough’s 1979 claim based on discrimination, which was apparently lodged on the basis that the ratio of assessment to true value would be found to be below the chapter 123 corridor, thus resulting in an increase of the original assessment. See Devonshire Develop. Associates v. Hackensack, supra. The ratio of assessment ($664,400) to true value ($563,092) is 118% which falls within the corridor (89%-121%). Accordingly, the application of the chap *92 ter 123 ratio is not justified, but pursuant to N.J.S.A. 54:2-40.4 c. the county percentage level of 100% must be applied since the chapter 123 ratio for 1979 was 105%.
The Clerk of the Tax Court is directed to enter judgment for all years as follows:
Land $391,300
Improvement 171,800 (rounded)
Total $ 563,100

The text of which follows:
Petitions of appeal, filed pursuant to the revisions of Chapter 2 of Title 54 of the revised statutes may be amended and amended petitions of appeal may be further amended, at any time, at or before the hearing of the appeal, without notice and as a matter of course. [L.1946, c. 161, § 11, supplementing Title 54, c. 2].
This provision was repealed by L.1979, c. 114, § 15, effective July 1, 1979.

The parallel provision concerning actions brought at the county tax board level is found in N.J.S.A. 54:3-22(c) to (f).

L. I960, c. 51, § 8, was codified as N.J.S.A. 54:4-11 (since repealed as to such property used for the year 1968 and thereafter by L. 1966, c. 138, § 12).

An explanation of the source and meaning of this language referring to a rebuttable presumption can be found in Tri-Terminal Corp. v. Edgewater, 68 N.J. 405, 346 A.2d 396 (1975), in its explanation of Kents:
... The average ratio of the Director’s sales ratio studies for the year in question for the particular municipality may be used as prima facie evidence of the level to which the true value of the property may be reduced if substantially greater than such ratio, [at 410, 346 A.2d 396]
The Tri-Terminal court referred to Kents (Kents 34 N.J. at 31, 166 A.2d 763) where it was stated that where there is no common level the average ratio (school aid) “should be deemed sufficient of the level to which reductions should be granted in the absence of circumstances indicating that the average should be modified for that purpose. The trier of facts may properly consider any weakness which may appear, as, for example, a paucity of sales in the municipality or some imbalance caused by unusual experience.” This passage is deftly illustrated by Feder v. Passaic, 105 N.J. Super. 157, 163, 251 A.2d 457 (App.Div.1969), where the court recalculated the Director’s school aid ratio for the year in question.

It is significant to note that if, in fact, chapter 123 was “in every case,” as plaintiff contends, then a taxpayer who very well might not have even pleaded discrimination could have its original assessment increased even though a municipality never took an appeal from the original assessment. See Devonshire Devel. Associates v. Hackensack, supra.