LASSER, P.J.T.C.
Taxpayer contests the 1982 real property tax assessments on a parcel of waterfront property containing approximately 342 acres, located partly in the Town of West New York, Hudson County, New Jersey (known as Block 168, Lots 2B, 3A, 3B, 4A, 4B, 5A, 6A, 6B, 7, 8A, 8B, 15A and 16) and partly in Weehawken Township, Hudson County, New Jersey (known as Block 11, Lot 6, Block 36D, Lots 5A, 5AA and 6A, Block 45, Lots 1, 2, 2A, 3, 4, 4A, 4B, 5A, 6, 7, 8 and 9A, Block 54, Lots 3, 9, 11 and 11A, and Block 64, Lots 1A, 2A, PT4, PT5 and 8). Weehawken has filed a counterclaim seeking an increase in taxpayer’s assessments. There are nine separately assessed parcels in West New York and 22 in Weehawken. The total 1982 property tax assessments in each taxing district are as follows:
West New York
Land 3.928.150
Improvements 198,000
Total 4.126.150
Weehawken
Land $ 5,149,400
Improvements 861,250
Total $ 6,010,650
Total West New York and Weehawken $10,136,800
Direct review of the assessments has been sought pursuant to N.J.S.A. 54:3-21. Taxpayer claims discrimination and relies on Chapter 123 of the Laws of 1973, N.J.S.A. 54:51A-6, for relief. The Taxation Division Director’s 1982 average ratios and common level ranges for West New York and Weehawken are as follows:
*308 West New York Weehawken
70% Average ratio 58%
59%-81% Common level range 49%-67%
The West New York and Weehawken cases were tried together. Taxpayer's appraisal expert was of the opinion that as of October 1, 1981, the market value of the subject property was $7,750,000. The appraisal expert who testified for both taxing districts was of the opinion that the market value of the subject property as of October 1, 1981 was $15,200,000.
Physical Description
The property is a waterfront tract of approximately 342 acres that extends for almost two miles along the Hudson River from Baldwin Avenue on the south to the boundary line between the towns of Guttenberg and West New York on the north. The tract is bordered on the west by Boulevard East and Hillside Avenue. Its eastern boundary is the pierhead line of the Hudson River, approximately four to five feet above the average tide of the river. The property had previously been owned by the Penn Central Railroad and was used as a rail marshalling yard. The property had been filled in by the railroad and is similar to other lands filled in by the railroad and others in Jersey City, Bayonne, Edgewater and other areas along the base of the Palisades.
The property is long and narrow and has limited access via Baldwin Avenue in the south (by a tortuous route under the support columns of the Lincoln Tunnel helix), Pershing Road in the center and Hillside Avenue in the north. There are several buildings on open deck timber piers. They are in poor condition. The parties have stipulated that these improvements are valueless. The property is subject to an underground easement granted to the Port of New York and New Jersey Authority for the Lincoln Tunnel, which cannot be built over.
The actual land size of the subject property is in dispute. In calculating land area, taxpayer’s expert relied on surveys, *309 deeds and calculations prepared by Pennone Associates, Inc. for Penn Central. The expert for the taxing districts relied on the assessment maps, state public utility maps and an agreement as to areas between the taxing districts and Penn Central in a prior case in calculating the land area. The experts’ land areas may be summarized as follows:
Taxpayer
West New York Weehawken Total
Upland 90 (60%) 90 (47%) 180
Submerged land 59 (40%) 103 (53%) 162
Total acres 149 193 342
Taxing Districts
West New York Weehawken Total
Upland 90.672 (58%) 99.328 (54%) 190
Submerged land 65.783 (42%) 85.777 (46%) 151.56
Total acres 156.455 185.105 341.56
Water is available to the property only in Weehawken. There are no sewer lines on the property, although sewer lines are not far from the property and the property may have an easement for a sewer tie-in.
A geotechnical engineer testified for taxpayer concerning the subsurface condition of the subject property. He stated that the subsurface is soft and in the 1800’s and 1900’s was filled in with all sorts of materials. The water table is four feet below the surface. His borings revealed that portions of the property needed surcharging, compacted fill and bulkheading. The majority of the land area is man-made organic fill added prior to 1900. The site has an average elevation of + 6 to +8 feet, except for abrupt increases in elevation to about + 100 feet at the Palisades along the western portion of the site. Deep foundations are required on most of the site for all but the lightest structures. Required piling depth ranges from 30 to 200 feet.
*310 Highest and Best Use
The experts disagree on the highest and best use of the subject property. Taxpayer’s expert finds the highest and best use of the property to be its permitted zoned use. The taxing districts’ expert, however, concludes that a zoning change is reasonably foreseeable based on the renewed interest in Hudson County waterfront properties. Many waterfront properties are in the planning or development stages for combined residential and commercial use. Therefore, it is this expert’s opinion that the highest and best use of the subject property is as a planned development for residential and commercial use, with a higher density of use than under the existing zoning. The West New York portion is in a controlled waterfront development district permitting residential and recreational uses and limited commercial use (10%). Height is limited to 32 feet and building coverage to 70%. The Weehawken portion is zoned 50% industrial park, 25% office park and 25% outdoor recreation. Height is limited to 130 feet but no higher than the top of the Palisades, and building coverage is limited to 60%.
True Value
Both experts based their determination of market value on the market data approach. While taxpayer’s expert produced 14 sales of alleged comparable properties, he relied primarily on the sale of the subject. This sale, by Penn Central to taxpayer, occurred on December 14, 1981, for an all-cash consideration of $7,750,000 (the contract of sale was dated November 2, 1981). It was the opinion of taxpayer’s expert that this sale was a bonafide arm’s length transaction and therefore the best evidence of the subject property’s market value as of the October 1, 1981 assessing date. The indicated sale price, based on the 342-acre land area utilized by this expert, was $22,661 an acre.
The 14 sales analyzed by taxpayer’s expert were of waterfront tracts in Jersey City, Hoboken, Weehawken, West New York, Guttenberg and Edgewater. However, the expert testified that he relied only on his first two comparable sales after *311 concluding that the others were too remote in time to support his opinion of the market value of the subject property.
His comparable number one (also the taxing districts’ expert’s comparable number one) was the December 12, 1981 sale for $2,488,095 of a 105.786-acre waterfront tract in Jersey City by the Trustees of the Erie Lackawanna Railroad Company to the Harborside Development Company. This property consists of 67 acres of upland (63% of total acreage) and 38.786 acres of submerged land (37% of total acreage). Comparable number one was zoned for industrial use, and taxpayer’s expert testified that he could not speculate as to whether a change in zoning for that property was foreseeable. Taxpayer’s expert was of the opinion that this sale was an arm’s length transaction. He adjusted the $23,520 an acre sale price downward 10% for access and 10% for size to reflect the inferior access and larger size of the subject property. This resulted in an $18,816 an acre value for the subject property.
His comparable number two was the March 6, 1981 sale for $2,931,738 of a 77.207-acre waterfront tract in Jersey City by Trustees of the Lehigh Valley Railroad Company to the Prolerized Schiabo New Company. This property consists of 46.421 acres of upland (60% of total acreage) and 30.786 acres of submerged land (40% of total acreage). The property was zoned for industrial use. Once again, taxpayer’s expert testified that he could not speculate on the possibility of a change in zoning. He opined that this sale also was an arm’s length transaction. The sale price of $37,972 an acre was adjusted downward 10% for access and 25% for size, resulting in a $24,682 an acre value for the subject property.
Taxpayer’s expert testified that he made no adjustment for location because the locations of sales numbers one and two were similar to that of the subject. No adjustment was made for subsurface soil conditions as the subject and comparables are all filled-in railroad land. Taxpayer’s expert testified that the subject sale and sales numbers one and two were sufficient in number and comparability to enable him to estimate the *312 market value of the subject property. Based on his sales analysis, he reached an estimated value for the subject property of $22,661 an acre, for a total value for the 342 acres of approximately $7,750,000.
The taxing districts’ appraisal expert also relied on the market approach. It was his opinion that the highest and best use of the property was as a planned development of residential and commercial uses and that all of the upland could be so developed, including the approximately 5%-10% occupied by the cliffs of the Palisades. Conceding that this use was not now a permitted use, the expert was of the opinion that it was a use that could be anticipated within a few years.
The expert was of the opinion, based on his analysis of comparable waterfront sales, that this property was worth $15,200,000 on October 1, 1981. It was his opinion that the $7,750,000 purchase price of the property was very low. The expert testified that prospective purchasers were discouraged from purchasing because of a proposed Department of Transportation (DOT) road that would bisect the property and because of the creation of the Weehawken Port Authority to acquire the Weehawken portion of the property by eminent domain.
The expert testified that from the mid-1960’s to 1980 there was little interest in Hudson County waterfront properties. There was no demand by either shipping or railroad interests for property for water-related uses. In 1980 the DOT abandoned its waterfront road project affecting the subject property. In early 1980, due to the proximity of the New Jersey waterfront to New York City, interest in development of waterfront properties for mixed residential and commercial use increased with the rising residential and office building market.
The expert for the taxing districts was of the opinion that the underwater land is of insignificant value itself, but that the aesthetic value of the water merges with the value of the upland. Consequently, he attributed no separate value to the submerged land and included the value of the submerged land
*313 in the value of the 190 upland acres of the subject. His analysis of sale number one (Erie Lackawanna Railroad Company to Harbor side Service Company) confirms taxpayer’s expert’s $23,520 an acre purchase price based on 105.786 acres, but if the purchase price is applied only to the upland, the price is $62,202 an acre. Further, the taxing districts’ expert testified that sale number one is inferior to the subject because (1) it has poor access to city streets through an easement at the foot of 12th Street to Pavonia Avenue and (2) it is industrially zoned and is not suitable for mixed residential and commercial uses.
The taxing districts’ expert testified that taxpayer’s sale number two (taxing districts’ sale number three, Lehigh Valley Railroad Co. to Prolerized Schiabo New Co.), part of the Claremont railroad yard, is zoned for high-density residential use. The purchase price for 46.421 acres of upland only is $63,155 an acre before adjustment for access and location.
In addition to analyzing the sale of the subject property and the same sales as taxpayer’s comparables numbers one and two, the taxing districts’ expert analyzed four Hudson County waterfront sales ranging in price from $43,064 to $167,037 an acre for upland only. They were:
Block 1507, Lot Part 2L; Jersey City (taxing districts’ sale number two)
Penn Central Corp. to the Port of New York and New Jersey Authority; 234.99 acres purchased December 30, 1981 for $6,010,347; overall price, $24,477 an acre. Upland only, $43,064 an acre. Purchased for use as a coalport. Area is suitable for industrial use. Access is inferior to subject. No potential for mixed residential and commercial use.
Block 17, Lots A-4; Jersey City (taxing districts’ sale number four)
Erie Lackawanna Railroad Co. to J.C. North Shore Associates; zoned industrial; 24.811 acres (5.69 upland, 19.12 submerged). Purchased October 25, 1979 for $391,992, deducting $50,000 for the value of the pier. The overall land price is $13,784 an acre but $60,081 an acre for upland only. Good access but poor neighborhood. Purchased as part of Newport City development for high-rise office building development.
Block 260, Lot 1; River Road, Hoboken (taxing district’s sale number five)
Hudson Realty Corp. (a subsidiary of Erie Lackawanna) to General Poods Corp.; 4.45 acres (1.33 acres upland, 3.12 acres submerged) zoned industrial. Purchased July 1978 for $80,000; reflects $17,977 an acre overall and $60,150 an *314 acre of upland. General Foods purchased adjacent property for additional office and manufacturing development; good access.
Block 168, Lot 12; West New York Block 44, Lots 1 & 2; Guttenberg (taxing districts’ sale number 6)
Stokely Van Camp, Inc. to Prudential Insurance Co. 18.427 acres (10.776 upland, 7.649 acres submerged) Purchased January 17, 1980 at $1,800,000. Overall price, $97,682 an acre; upland only, $167,037 an acre. Purchased by contiguous owner for marina, a water-related use in connection with Galaxy Apts.; property is superior to subject.
It was the opinion of the expert for the taxing districts that the $40,789 an acre purchase price (upland only) of the subject property represents the value of the property with existing zoning and subject to the uncertainties of the proposed DOT road bisecting the property and the possibility of condemnation by the Weehawken Port Authority, without consideration of its development potential for mixed residential and commercial uses. The expert opined that the 1981 sale price would have been substantially higher if this property had been exposed to the market for a few years without the threat of either condemnation by the Weehawken Port Authority or the DOT road being built through the property. He testified that his sales numbers one and three in Jersey City and number five in Hoboken were properties with mixed residential and commercial development potential, and that they reflected a value of $60,000 an acre for upland only.
The taxing districts’ expert testified that waterfront property zoned only for industrial use sells for $40,000 an upland acre. However, this expert, in response to a question from the court as to his opinion of the value of the subject property as zoned on the assessing date, stated that it would be worth $50,000-$55,000 an upland acre. He stated that sale number two, the 77.207-acre Lehigh Valley Railroad Company property, was zoned similarly to the existing zoning of the subject and was sold at $43,064 an upland acre. This figure, he said, would have to be adjusted for location (principally for tax rate differential and stability) to reflect $50,000-$55,000 an acre for the subject. He makes no adjustment for the substantially larger size of the subject. It was his opinion that the subject property *315 would have sold in this $50,000-$55,000 an upland acre range but for the market-limiting, proposed DOT road and the threat of condemnation.
The taxing districts’ expert concluded from his study of Hudson County waterfront sales that the development potential of the subject property results in the subject being worth $20,000 an acre more than the $60,000-$63,000 an upland acre range of four of his seven comparables. It is his opinion that the subject property is worth $80,000 an acre of upland. At $80,000 an acre, the value of the 190 acres of upland is $15,200,000, divided by the expert between the taxing districts as follows:
West New York $7,253,800 Weehawken 7,946,200
The Sale of the Subject Property
The subject property had been used as a rail-marshalling yard by the Penn Central Railroad. In June 1970, bankruptcy proceedings were initiated against the railroad. In 1973, Victor Palmieri, Inc. was engaged by the trustee in bankruptcy to market approximately 50 properties of the railroad in the New York metropolitan area, including six major rail yards, of which the subject was one.
The subject property was widely advertised for sale individually and as part of a general marketing campaign. The railroad bankruptcy terminated in October 1978, and the company emerged as a major holding company with over two billion dollars in assets. A vice-president of Victor Palmieri, Inc. who was responsible for the marketing of the subject property testified that there were 425 responses to the New Jersey marketing effort and 65 requests for information about the subject property. Between 1975 and 1981 there were serious talks with a dozen prospective purchasers. Sale of the whole or portions of the property, retention of the property by Penn Central for later development, or a joint venture between the railroad and a developer were considered. In 1981 representatives of the railroad believed that the value of the parcel was *316 $8,000,000. In September 1981, taxpayer’s representatives offered $6,000,000. Negotiations resulted in an all-cash price of $7,750,000, as is, with no conditions. This price was approved by Penn Central’s Board of Directors in October 1981 and the closing took place in December 1981.
Discussion
The ultimate fact to be determined is the market value of the subject property on the assessing date, October 1, 1981. N.J. S.A. 54:4-23. Market value has been defined as: “the most probable price in cash, terms equivalent to cash, or in other precisely revealed terms, for which the appraised property will sell in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.” American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) at 33. “The statutory criterion [N.J.S.A. 54:4-23] for determining [true] value is the consideration of the market value at a fair and bona fide sale by private contract.” Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 162, 65 A.2d 828 (1949).
A sale subsequent to the assessing date, but reflecting the market value as of the assessing date, is admissible evidence of market value. Sage v. Bernards Tp., 5 N.J.Tax 52, 67 (Tax Ct.1982); Diament v. Fort Lee, 3 N.J.Tax 70, 87 (Tax Ct.1981); Almax Builders, Inc. v. Perth Ambov, 1 N.J.Tax 31, 35-38 (Tax Ct.1980). The selling price of the subject “is a guiding indicium of fair value and ordinarily is merely evidential although it might under peculiar circumstances become controlling, subject to the limitation that the determination properly involved the weighing and appraising of all component factors and adventitious circumstances.” Hackensack Water Co., supra, 2 N.J. at 162-163, 65 A.2d 828; see also L. Bamberger & Co. v. Tax Appeals Div., 1 N.J. 151, 62 A.2d 389 (1948); Sage, supra, 5 N.J.Tax at 67.
*317 The sale of the subject property occurred shortly after the assessing date, close enough to October 1, 1981 to reflect the value on that date. Taxpayer’s expert testified that the sale price reflected the value on the assessing date, and there was no proof by the taxing district of a change in circumstances occurring between October 1, 1981 and the November 2, 1981 date of the contract of sale or the December 14, 1981 closing. The sale was an arm’s length, negotiated transaction between knowledgeable, unrelated parties for an all-cash consideration. Furthermore, the subject property is an unusual parcel of land. It is not common to find a large parcel of land in close proximity to New York City. The subject property is larger than any of the properties used by the experts as comparable sales. Its subsurface conditions require expensive foundations. The lengthy waterfront will necessitate expensive bulkheading. A portion of the property is Palisades cliffs. There is limited access, and the portion of the property subject to an easement granted to the Port of New York and New Jersey Authority cannot be built over.
The subject property is an unusual parcel of land, and therefore, its sale is a more reliable indicator of its value than are sales of waterfront properties that are smaller in size, have differing characteristics and are located in other municipalities. Compare Halocarbon Products v. South River Boro, 1 N.J.Tax 294, 302 (Tax Ct.1980), aff’d 181 N.J.Super. 1 (App.Div.1981), with Sage and Diament, both supra.
I find that the sale of the subject property meets the requirements for its use as the best evidence of the market value of the subject property. Halocarbon Products, supra (sale price of subject held best evidence of market value after “weighing and appraising of all component factors and adventitious circumstances.”). I do not find evidence of pressure compelling the seller to sell at a price less than the fair market value of the property. I find that the purchase price reflects the market value of the property, notwithstanding the buyer’s agreement to accept a bargain and sale deed without covenants *318 against grantor’s .acts, the buyer’s payment of one-half of the realty transfer fee and the culmination of the sale without protracted negotiations.
The sale price of the subject property was $22,661 an acre overall, or $40,789 an acre of upland only. Taxpayer’s expert relied most heavily on the subject sale and on two of the 14 waterfront properties he considered.
The expert for the taxing districts was of the opinion that the land would be worth $80,000 an upland acre if the zoning were changed to permit planned development of mixed residential and commercial use. These uses are not presently permitted, but this expert is of the opinion that zoning changes to permit these uses can be foreseen in a few years.
I do not accept the conclusion of the expert for the taxing districts that the subject property should be valued on October 1, 1981 as if it were zoned to permit higher density, planned development of mixed residential and commercial uses. Obtaining permission from two towns for a zoning change for a tract lying within their borders and from the Department of Environmental Protection, the Corps of Engineers and other regulatory bodies would require a substantial period of time, with hurdles and hazards along the way that might defeat such a zoning change. The proofs do not support a finding that there was a probability of a zoning change in the near future. See State v. Gorga, 26 N.J. 113, 116-118, 138 A.2d 833 (1958). See also State v. Market Associates, 134 N.J.Super. 282, 340 A.2d 663 (App.Div.1975); Warren v. Jackson Tp., 1 N.J.Tax 536 (Tax Ct.1980); cf. State v. Interpace Corp., 130 N.J.Super. 322, 327 A.2d 225 (App.Div.1974) (proof of potential impairment of access too speculative).
I note that local property tax assessing is a year to year process. Each annual assessment is a separate entity distinct from the assessment of previous or subsequent years. Aetna Life Insurance Co. v. City of Newark, 10 N.J. 99, 103, 89 A.2d 385 (1952). Zoning changes can be reflected in future assess *319 ments to the extent that they change the value of the subject property.
The expert for the taxing districts was further of the opinion that the subject property was worth $50,000-$55,000 an upland acre with the existing zoning. The property sold for $40,789 an upland acre. The taxing districts’ expert explains that the $10,000-$15,000 difference was caused by the depressing effect of the proposed DOT road and the possibility of condemnation by the Weehawken Port Authority. The influence of the proposed DOT road was no longer a factor by 1980, the year DOT abandoned the project. There is no evidence of the possibility of condemnation other than the statement by the expert for the taxing districts that the possibility existed. The taxing districts made no attempt to introduce facts to support this statement or to quantify the effect of the possibility of condemnation on the sale price.
Even if on the assessing date there was a probability of a zoning change or a possibility of condemnation or of a DOT road through the property, all factors relating to the market are resolved by the arm’s length, cash transaction of an extensively marketed property between sophisticated parties. There is no proof that the negotiated sale price did not take into consideration all factors affecting the market value of the property at the time of sale. I therefore conclude that as of October 1, 1981 the market value of the subject property was $7,750,000, the sale price.
The experts for both taxpayer and the taxing districts agreed on the subject property’s total land area of approximately 342 acres but did not agree on its allocation. I accept the taxing districts’ upland area and submerged land area figures because no survey evidence separately setting forth upland and submerged land was introduced by taxpayer to overcome these figures. The expert for the taxing districts allocated the market value of the property between the taxing districts based on the upland area, and I will accept that method. I allocate the market value as follows:
*320 West New York $3,698,500 (rounded)
Weehawken 4,051,500 (rounded)
Total $7,750,000
Discriminatioh
The 1982 West New York assessment totals $4,126,150. The upper limit of the common level range is 67%. The assessment exceeds 67% ' of the value ($3,698,500 X .67 = $2,477,995). Therefore, the West New York assessment must be reduced to 58% of value, the average ratio, or $2,145,130. N.J.S.A. 54:51A-6.
The 1982 Weehawken assessment totals $6,010,650. The upper limit of the common level range is 81%. The assessment exceeds 81% of the value ($4,051,500 X .81 = $3,281,715). Therefore the Weehawken assessment must be reduced to 70% of value, the average ratio, or $2,836,050.
The parties will allocate the assessments, as reduced, to the nine West New York and 22 Weehawken separate assessments, in accordance with R. 8:9-3,4, within 20 days of receipt of this opinion. Entry of judgment will be held pending receipt of the allocation computations from the parties.