L. BAMBERGER & CO., A CORPORATION, PLAINTIFF-APPELLANT, v. THE DIVISION OF TAX APPEALS OF THE DEPARTMENT OF TAXATION AND FINANCE, AND CITY OF NEWARK, DEFENDANTS-RESPONDENTS.

Argued November 23, 1948—Decided December 6, 1948.

Mr. *Ralph E. Lum* and Mr. *Herbert J. Hannoch* argued the cause for the plaintiff-appellant (*Messrs. Lum, Fairlie & Foster,* attorneys).

Mr. *Vincent J. Casale* argued the cause for the defendant-respondent City of Newark (*Mr. Thomas L. Parsonnet,* attorney).

The opinion of the court was delivered by

CASE, J.   The appeal is from a judgment of the former Supreme Court, whose opinion is reported in 136 *N. J. L.* 463, dismissing a writ of *certiorari.* The writ had brought up judgments of the Division of Tax Appeals of the Department of Taxation and Finance affirming the assessments of appellant's property in the City of Newark for the years 1944 and 1945.

The Essex County Board of Taxation had earlier affirmed the assessments. The property consisted of the land and the building thereon forming the entire block bounded by Market, Halsey, Bank and Washington Streets in the City of Newark and was used as a unit by Bamberger for its store purposes. The assessment was $9,172,900.00 for each year, allocated $3,485,-200.00 to land and $5,687,700.00 to improvements.

The fundamental legal propositions upon which appellant's argument is substantially rested may be conceded. The constitutional provision was that property should be assessed according to its true value (1844 *Constitution* as amended 1875, *Article* IV, *Section* VII, *para.* 12). The assessor was directed by statute *(R. S.* 54:4-23) to determine a price for which, in his judgment, the property would sell at a fair and *bona fide* sale by private contract on October first next preceding the date on which he should complete his assessments, viz., the first day of October preceding the tax year. The Court of Errors and Appeals deduced the legislative conception to be that such a selling price was to be the guiding indicium of fair value, *New Jersey Bell Telephone Co. v. Newark,* 124 *N. J. L.* 451 *(E. & A.* 1940), affirming on the opinion of the Supreme Court, 118 *N. J. L.* 490, 494 *(1937),* and that while ordinarily the selling price was merely evidential, it might under peculiar circumstances become controlling subject to the limitation that the determination properly involved the weighing and appraising of all component factors and adventitious circumstances, *North Bergen Township v. Bergen Boulevard Holding Co.,* 133 *N. J. L.* 569 *(E. & A.* 1945).

The building was erected in three parts, the first in 1912–13, the second in 1923–24 and the last in 1928–29. The entire property, with an exception· presently to be noticed, was sold by Bamberger to the Aetna Life Insurance Company in December of 1945; subsequent, as will be observed, to the assessing dates for the disputed taxes. The sale was *bona fide,* from a willing seller to a willing buyer. The designated sale price $6,750,-000.00 was paid in cash. Bamberger would have that sale price control the assessment; if not actually control, then carry greater influence than it was accorded. And that is the nub of

the present controversy. Superficially, the question may appear to have legal aspects; actually it is one of studying and weighing the facts, arranging them in true perspective and from them appraising the value.

Bamberger did not sell under duress; it considered that it could use its money in its merchandising business to better advantage than in owning real estate; it preferred to be a tenant rather than a landlord. But it would not and did not sell except upon conditions named by it, and those conditions included a lease for a period of twenty-two years, with options to Bamberger of renewing for periods extending to the year 2034, upon terms such as the right to demolish and to construct and the duty to pay taxes. The lease gave to Bamberger many of the rights and laid upon it many of the duties of ownership for the duration of its leasehold; not a preexisting leasehold by a third party, but one contemporaneously carved by it out of the estate sold. Aetna bought without any constraint so to do except its desire to make proper investment, with such increment as safety permitted, of its capital funds. Other competitive and potential buyers were Columbia University (for its endowment fund), Equitable Life Assurance Society and Northwestern Life Insurance Company. The active market from which the sale emerged was composed of companies with capital obligations; that is to say, of companies whose business was of such a nature as to require the investment of capital funds with safety of principal the primary duty, and with the volume of increment secondary to and dependent upon the preservation of capital.

Bamburger argues that the economic impulses which led either seller or buyer to engage in the transaction were of no concern to the assessor; and that is true. But the conditions which those impulses led the participants, and particularly the present appellant, to impose upon the transaction were very much the concern of the assessor in formulating his judgment as to whether or not the sale was in such a market and under such circumstances as to constitute the immediate transfer of dollars the measure of value and the sale a fair sale within the purview of our tax laws. It was open to him to determine that

a part of the value in the transaction lay in what was really the estate reserved to Bamberger. It was, we may assume, of great interest to Aetna to be assured of a responsible tenant whose obligations under the lease were guaranteed by R. H. Macy & Co., sole owner of Bamberger; but the nature of the transaction tended to shut out all prospective buyers beyond the class mentioned above and, specifically, it shut out any prospective competitor of Bamberger from entering the field. It is not a baseless suggestion that some large merchandiser from elsewhere might have been interested in opening a Newark establishment in that favorable and well-advertised location, just as Bamberger proposed, according to the proofs, to use a part of its released funds for the opening of new stores in other urban and suburban centers. The immediate money consideration, although it was evidential, was not controlling in fixing true value.

The construction costs of the building in its various stages as disclosed by Bamberger were respectively:—

| | | |
|---|---|---:|
| First construction | 1912–13 | $2,602,058.91 |
| Second " | 1923–24 | 1,385,252.22 |
| Third " | 1928–29 | 11,945,637.36 |
| | | 15,932,948.49 |
| Charges to capital investment since buildings were erected | | 137,371.97 |
| Total building construction | | 16,070,320.46 |
| Company depreciation on its own books, including 1945 ($477,037.63), | | 9,166,639.82 |
| | | 6,903,680.64 |
| Paid for the purchase of land | | 2,826,706.47 |
| Total book value, 1945, on this computation | | $9,730,387.11 |

The amount at which Bamberger carried the property on its books is stated in round numbers and for the purposes of the argument to be $9,750,000.00, or approximately $3,000,000.00 more than the sale price which it wishes to have established as true value for taxation purposes; and that also is a fact to be considered. Inasmuch as the land costs were stated in the Bam-

berger computation to be "land costs at time of purchase" of the property 109–135 Market Street, we understand that the land at the corner of Market and Halsey Streets, hereinafter specifically mentioned, which was never purchased by or in the ownership of Bamberger, was not included in that computation. If our understanding in this respect is correct, the foregoing 1945 computation from the Bamberger books would be amplified in that amount, giving its book figure of value of property sold to Aetna at approximately $10,198,988.00 against the assessment of $9,172,900.00; and the 1944 figures would give a valuation $477,037.63 greater for the reason that the amount of the company's deduction for depreciation for the year 1945 was $477,037.63 and would not apply to the 1944 assessment. But the fact as to the exclusion or inclusion of the Halsey Street corner in the statement of land costs is not essential to this branch of the reasoning because even without that addition the books of the owner showed a value after depreciation in buildings in excess of the assessment; and the book figures carried the original costs of the lands without addition for increased values in the interim.

The building assessments from 1929 to 1945, inclusive, were as follows:—

| | |
|---|---|
| 1929 | $4,543,600.00 |
| 1930 | 5,437,000.00 |
| 1931–1938 inc. | 5,887,700.00 |
| 1939–1945 inc. | 5,687,700.00 |

Assessments on the land from 1929 to 1933, inclusive, were stationary at $3,323,600.00; from 1934 to 1945 they were $3,485,200.00. Appellant points to the fact that the building assessment stood at the same figure from 1939 forward and argues a self-evident failure by the assessor to recognize depreciation. The contention fails to allow for steadily mounting and, so far as can be foreseen, permanently increased material and labour costs. The same line of reasoning that makes depreciation a factor in determining value makes increase in building costs a countervailing factor, ordinarily used as an element in calculating value on the basis of reproduction cost less depreciation. Such terms as depreciation and obsolescence vary in their sig-

nificance with the uses to which they are put. Depreciation, in the bookkeeping economy of the owner, may signify such a uniform and periodically recurring charge against its worth as at a time which is arbitrarily forecasted to mark the end of the life of a specific item of property will have erased the cost of the property as a capital asset; whereas depreciation for our taxation purposes is a factor used with other factors in determining current market value. Permanently lessened value of the dollar with attendant economic conditions may result in giving property a market value which for a compensating period disregards or modifies allowance for physical depreciation.

The tax history of the property presents further evidential sidelights. The assessments from 1929 to 1933 were subjected to no appeals although the assessments for the last three of those years were $9,211,300.00. From 1934 to 1937 there were appeals which ended with the fixing of the assessment by the State Board at $9,372,900.00. In 1938, the assessment was at that figure, with no appeal. From 1939 to 1942 there were appeals which ended with a judgment entered by consent placing the assessment at $9,172,900.00. The assessment for 1943 was in that amount with no appeal; and that, too, is the amount of the presently disputed assessments, including, as always, the hereinafter mentioned Weiler tract.

Witnesses qualifying as experts on the several phases of real property values testified to their varying views which we shall not analyze beyond the generalizations that believable support is there to be found for the assessments and that even the testimony of the expert witnesses for the appellant is consistent with the view that the sale price to Aetna did not represent true value in the tax sense.

■ The exception from the ownership by Bamberger of lands occupied by its store and consequently from the lands sold to Aetna consists of a plot at the corner of Market and Halsey Streets with a frontage of 47.28 feet on Market Street, a width at the rear of 30.49 feet and a frontage of 126 feet on Halsey Street, owned by the estate of Peter R. Weiler, deceased, and held by Bamberger under a long term extendable lease made February 1, 1904, and yet, upon option, to run until

May, 1970. It was and is occupied, along with the lands now owned by Aetna, by the Bamberger store building. There is no other use. The main entrance to the store at the Halsey Street corner is partly on the Aetna land and partly on the Weiler land. The so-called "corner influence" extends beyond the excepted plot into the general tract. The assessments have been made, throughout the Bamberger dominance, as a unit upon the lands and as a unit upon the building; so made and so accepted. No objection to that method of over-all assessment was set forth in the petitions of appeal to the State Board and no harm has resulted from the pursued course. Bamberger was and is the sole occupant and the sole taxpayer for both properties. Expert testimony for each side was given on the hypothesis of common ownership. Appellant does not here argue that the assessment was defective because made upon the properties as a unit; the argument goes to relative and distinguished values which, on the present issue and under the facts of the case, present no materiality. Our objective is not to decide precisely what property was sold to Aetna nor what the value of it was for the purpose of determining profit or loss. We are to determine the legality of the 1944 and 1945 assessments upon property which included the property sold and other property; all of which, however, had been assessed in just that way for many years, all of which was possessed and used as a unit by Bamberger as the sole occupant and on all of which the taxes were to be paid by Bamberger and Bamberger alone. There are no complications involving the rights or duties of third parties. We find no occasion, on this appeal, for varying the disputed assessments to reflect either a division in the land values or to determine how much of the building assessment should be apportioned to the Weiler lands and how much to the Aetna lands. If the suggestion is that the value of the building, as an intirety, be prorated between the Aetna and the Weiler lands, no useful purpose will be accomplished. That we believe to be appellant's contention as it argues for an assessment upon the sum of the Aetna sale and the amount which it attributes to the Weiler property. But we have eliminated that sale as a controlling factor, and the argument goes with it. If, how-

ever, it is intended that the building should be assessed in two parts at such values that the sum of the two would be less than the whole upon the theory that at some time in the distant future, when perhaps the value shall have been fully amortized, a separation of the structure physically and in point of usage into two parts corresponding to the divided ownership of the land will leave each of the parts an incomplete building and therefore, by anticipation, of less present value, we express our view *contra*.

The entire controversy, as we have said, is essentially factual. The proofs substantially support the findings of the lower tribunals. There is a presumption that an assessment made by the proper authority is correct, and the burden is on the taxpayer to show otherwise. *Estell v. Hawkens,* 50 *N. J. L.* 122 *(Sup. Ct.* 1887*); New Jersey Bell Telephone Co. v. Newark, supra.* The appellant did not meet that burden.

The judgment under appeal will be affirmed.

*For affirmance:* Chief Justice VANDERBILT, Justices CASE, OLIPHANT, BURLING and ACKERSON—5.

*For reversal:* None.