LARIO, J.T.C.
This matter is the companion case to Sage v. Bernards Tp., 5 N.J. Tax 52 decided this day. As stated in Sage, it was stipulated and approved by the court that all evidence produced in Sage would be incorporated herein except as to those areas of valuation which by their very nature are not interchangeable. Therefore, all findings of fact and conclusions of law as determined in that case involving issues similar to those in this matter are hereby adopted and included in this opinion.
Plaintiffs’ objections and allegations concerning the assessments in this matter are identical to those contained in Sage and, additionally, they allege that since this property is within the flood plain, the assessment failed to include a proper adjustment for such designation.
Taxpayers appeal from a judgment of the Somerset County Board of Taxation affirming an assessment of $246,000 for the tax year 1980 on vacant land listed as Block 182, Lot 2, on the tax map of Bernards Township. As in Sage, this property was *42 included in the zoning litigation described in Sage. The consent order of May 10, 1979 included the following directions concerning the subject property:
5. The proposed zoning amendment shall include the following provisions and considerations...
(a) With respect to the property located within the new zone, all properties located below elevation 219 (for properties west of Acken Road), elevation 218 (for properties between Acken Road and King George Road) and elevation 216 (for properties east of King George Road) shall be considered wet-land and all properties located at or above such elevations respectively shall be considered dry land.
(b) All construction on dry land shall be permitted at a density of 5.5 units per acre.
(c) All wet-land will have a transferable development right to construction purposes of one unit per acre.
(d) A maximum of 65% of all dry lands may be developed as multi-family units.
The property contains 82.77 ± acres, irregular in shape. It lies between the westerly side of King George Road and the Dead River, which is the Bernards-Warren Township boundary. There are 1,608.43 feet of frontage on King George Road and it extends 1,700 feet irregularly to the center of the Dead River, where its boundary follows the zig-zag course of the river for 3532 ± feet. The property has access to municipal water, electric and telephone service. Sanitary sewers were not available at the premises on the assessing date. There is only a limited capacity in the existing municipal sewer plant for additional hookups and the subject property could not hookup thereto without a special waiver which apparently was not feasible as of that date. A private package treatment facility could be utilized for the tract, but it would only be permitted as an interim measure if ultimately there was a tie-in to the township’s sewer system.
The parties presented as their respective valuation experts for this property the same experts who testified in Sage. Both experts stated that the subject property is totally within the flood plain but they differed as to the property’s highest and best use. Mr. Murray considered the highest and best use as of the assessing date to be limited farmland, recreational facilities, “or something of that nature,” whereas Mr. Turteltaub used as *43 his basis for highest and best use the uses permitted by the final consent judgment of May 10, 1979.
In arriving at his final conclusion of highest and best use, Murray stated he did not take into consideration the effect that either the final judgment of May 10, 1979 or the resulting PRN zoning had on the property. It was his opinion that since the zoning had not been completed by October 1, 1979, it could not be considered. However, he said that even if the PRN zoning were to be given effect, it did not change his opinion of value, his reason being that since the property is wholly within the wetlands, it could not be developed, and therefore its value would be solely for purposes of agricultural use, plus the value of its transfer development rights. He further stated that an investigation did not show any place to which the transfer rights could be transferred, claiming that under the plan as finally adopted, the number of transfer rights created far outnumbered the rights that could be utilized under the highest density permitted; therefore, it was his opinion that the transfer rights would have no value. He determined the value of the subject property by the market approach, relying upon his sales study. In conducting his study he eliminated all individual lot sales, sales where the area was less than ten acres, and industrial or commercially zoned land since he felt they could not be adjusted with any degree of accuracy. As a result, his study was limited to the same two sales as in the Sage matter, to wit, Clark and Grigsby, having prepared a combined appraisal report for both appeals.
My findings and conclusions for those two sales are set forth in the Sage matter; however, as those sales relate to this tract, I find additionally as follows.
The Grigsby property is located within 800 to 2,000 feet of the subject property. Murray calculated Mrs. Grigsby’s life estate, based upon her 65 years of age, to be valued at $50,000, which he offset by deducting the value of the improvements which he also estimated to be $50,000. Therefore, he applied the full purchase price of $500,000 to the land, which gave him an average value of $2,370 an acre.
*44 Referring to the Clark sale, Murray stated that at the time of its conveyance the entire property, which is vacant land, was within the proposed flood hazard zone, and that the sale reflected a value of $3,000 an acre. His final conclusion of value as of October 1, 1979 was $1,200 to $1,500 an acre.
In formulating his final opinion of value, Turteltaub used as his basis the uses directed by the final judgment of May 10, 1979. It was his opinion that any purchaser of the subject property as of October 1,1979 would purchase the property with the knowledge and anticipation that the uses permitted by the proposed zoning ordinance, scheduled for final passage the next day, would be the permitted uses to which he the purchaser would be entitled. Contained in both the judge’s order and the plan as proposed as of October 1,1979, owners of wetlands were entitled to sell off development rights to designated upland property within the zone. Turteltaub gave specific weight to the judge’s order because that order firmly fixed the zoning on the property. Under the plan as proposed as of October 1,1979 which reflected the consent order, PRN zone was established which permitted 5.5 dwelling units an acre on “dry land” and one dwelling unit an acre on “wet land.” A transfer of residential density credits is permitted from “wet lands” to the “dry lands” within the zone. On lands from which all residential density credits have been transferred, further dwelling units were prohibited, and its only remaining permitted uses include church, public school, park and farming.
He calculated the subject to be entitled to 82 units of transfer development rights. In his opinion the property’s highest and best use as of October 1, 1979 was to sell off the transfer development rights to which the subject was entitled, which he concluded basically to be the value of the property. After the rights have been sold, since he claimed the property is wholly within the wetlands, the remainder property’s only permitted uses under the zoning ordinance would be for agriculture, church purposes, public schools and as a park; therefore, he gave the remainder no value.
*45 Turteltaub stated that “transfer development rights” is a relatively new concept and that he had not previously valued such a right nor did he know of any law suit wherein a development right had been valued. After making a study of this concept it was his opinion that the value of a transfer development right would be determined by what another landowner in Bernards Township would be willing to pay for it and that this price would be based mainly upon the value of the developable fee land that was receiving the rights. Since no transfer development right had previously been sold within Bernards Township, he stated it was necessary to look outside of the area for an indication of its value. Within a reasonable distance of Bernards Township he was able to find only one sale of residential development rights. That sale occurred in September 1978 in the Town of Hillsboro, located within Somerset County. He did not attempt to relate this sale to the subject to establish a per unit value of the subject; instead, he utilized it to ascertain an acceptable method of valuing a development right. Therefore, he did not believe that Hillsboro’s being 25 to 40 miles away from Bernards Township in any way detracted from the study.
The original Hillsboro sale consisted of a 74 ± acre tract which was entitled to 24 transfer development rights. It sold for $73,724, which came to a unit price of $3,070. The residual fee (the ground remaining after the rights were transferred) was given to the municipality.
At about the same time, the purchaser of the rights purchased a tract consisting of 28.418 acres zoned for 110 development units, for a consideration of $449,714, or $4,088 a unit. This tract required extensive off-site improvements in the way of sewer and water. With the acquisition of the 24 transfer rights, this second property now could be developed with 134 units. In analyzing these two sales Turteltaub concluded that the purchaser was mainly purchasing development units; therefore, he paid $3,000 a unit for the units transferred, and $4,000 a unit for the rights with the fee land that was to be developed. After analyzing these transactions it was his opinion that the value of *46 a development right is approximately 75% of the per unit value of the land upon which the right can be placed.
After the two purchases the buyer installed sewer and water and received preliminary approval for the development of the property as a 134-unit project. In February 1981 he sold the 134-unit project at $9,750 a unit. This resale was not considered by Turteltaub in determining the value of the transfer rights; the main purpose in presenting it was to illustrate that there is a merger of the purchased development rights with the rights existing on the developable property upon completion of the transfer.
After concluding a transfer right to be worth 75% of the per unit value of the upland property, he acknowledged that the next question to be resolved in determining the value of the subject property’s 82 transfer rights was: 75% of what? He then made a study of the eligible land in Bernards Township to which the development rights could be transferred and concluded that they are all smaller tracts than the Sage tract. It was his opinion that a smaller tract for 100 or so units would have an estimated value of $5,500 to $6,000 a unit as of October 1, 1979; however, he utilized the lower unit value of $5,000 that he previously gave for Sage. Applying 75% thereto resulted in a transfer right value of $3,750. Since the subject property has a minimum of 82 transfer rights, he calculated their total value as $307,500. Since he gave no value to the remainder, this figure represented his fair market value for the subject as of October 1, 1979. .
In the presentation of their respective cases plaintiffs have proposed a value of $99,324 to $124,155, whereas defendant submits a value of $307,500. The basic difference is the respective experts’ opinions of the highest and best use of the property. Murray testified that the highest and best use for the property is its limited use for agriculture, etc., assigning no value to the transfer rights. Turteltaub stated that the highest and best use was the sale value of the transfer rights and that the remainder would then have little or no value.
*47 “Highest and best use for land is the use that, at the time of appraisal [valuation date], is the most profitable likely use.” American Institute of Real Estate Appraisers, Appraisal of Real Estate (7 ed. 1978), at 43.
It is the conclusion of this court that the highest and best use of the subject property is a combination of both of the experts’ opinions. As this court concluded in the Sage matter, sellers and buyers in the market on October 1,1979 would consider the proposed zoning ordinance that had been scheduled for a second reading on October 2, 1979 as an accomplished fact. Murray stated that although he did not consider transfer rights as being in existence on the assessing date, even if they were, he considered them to have no value because there was no ground within the zone that could legally receive them. This assumption is incorrect. Marshall Frost, the former acting township engineer and present consultant to the planning board, presented as a witness by plaintiffs, testifying from the wetlands map placed in evidence, stated there were “600 and some” wetland rights created and less than 600 acres of dry lands within the zone capable of absorbing them. After a closer examination of the map he concluded that all but approximately 40 development rights could be transferred within the zone. From the testimony presented, I find that transfer rights could be transferred from the subject property to the upland within the PRN zone of the township; that transfer rights definitely had a sales value as of October 1, 1979 and that these transfer rights constitute the most valuable portion of the subject property.
Under the plan, once the transfer rights have been sold, the remainder land cannot be subsequently developed for residential purposes. The only use then permitted would have been as a church, public school, park or farm.
In considering the property in its present wetlands condition, Murray stated it was undevelopable; therefore, its highest and best use was as agricultural or like use. This use is very similar to the use that would be permitted for the remainder of the property if the development rights were fully transferred. Murray valued the land for such use at $1,200 to $1,500 an acre.
*48 Both Murray and Turteltaub based their respective final conclusion of value upon the assumption that the entire tract was in the wetlands. I find this assumption to be incorrect. Peter A. Messina, the township engineer, called by plaintiffs and testifying from an examination of a wildlife map compiled by the United States Army Corps of Engineers, stated that approximately one acre was not within the flood plain. I accept this statement to be correct.
In arriving at his final conclusion of the value of the subject property without transfer rights, Murray relied upon two sales. In addition to its other objections as explained in Sage, the Grigsby sale had the following which detracted from its comparability. The sale included improvements which he valued at $50,000; however, no description of the improvements was given; their size, construction and condition are unknown. He gave no basis for this value, which was pure conclusion unsupported by any data; hence, it is impossible to evaluate this portion of his testimony. The Clark sale, at $3,000 an acre, was stated to be fully within the wetlands. How he adjusted the sales prices of these two sales to arrive at a value of between $1,200 and $1,500 an acre was not documented. When questioned about his adjusted values, he stated he reduced the sales price figure by 50% to 60% based upon his experience of sales of lands that were substantially less developable than others; however, none of these sales were described or introduced into evidence. The determination of the weight to be given to the testimony of an expert witness depends not only on his candor, intelligence and experience but also on the facts and reasoning which form the foundation of the expert’s reasoning. Passaic v. Gera Mills, 55 N.J.Super. 73, 150 A.2d 67 (App.Div.1959), certif. den. 30 N.J. 153, 152 A.2d 171 (1959); In re Port of New York Auth., 28 N.J.Super. 575, 101 A.2d 365 (App.Div.1953).
In valuing the transfer development rights Turteltaub admitted that these rights are new in concept and that he made a study of the subject to ascertain how best to value these rights. The only sale of transfer development rights that he *49 was able to locate was in Hillsboro. The analysis of this sale by Turteltaub presents a novel appraisal method which appears to be extremely logical and convincing. Our courts have stated on numerous occasions that there can be no rule or single doctrinaire approach to determine the value of real property. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 72, 208 A.2d 153 (App.Div.1965); “the answer depends upon the particular facts and the reaction to them of experts steeped in the history and hopes of the area.” New Brunswick v. Tax Appeals Div., 39 N.J. 537, 544, 189 A.2d 702 (1963). This court is of the opinion that Turteltaub’s conclusion that the value of transfer development rights is based upon the value of the ground which receives them, is founded upon sound reasoning and is an acceptable method.
Although I have determined the valuation of transfer rights at a percentage of the value of the developable units on the receiving property is an acceptable approach, it still must be determined (a) What is the correct percentage? (b) What is to be included in determining the value of the developable units of the receiving property? and (c) What is the value of the units for the receiving ground in Bernards Township?
By his study of the Hillsboro sales, Turteltaub had answered questions (a) and (b) by concluding a percentage of 75%. In arriving at this percentage he has relied upon one sale. Admittedly, this is the only sale of transfer development rights that was available. This conclusion may ultimately be correct; however, a single sale is not a sufficient sampling to arrive at a firm conclusion. The inquiry relates to what purchasers of property of this kind will pay and what willing sellers will demand in sales of this type. “The search, of course, is for the fair value of the property, the price a willing buyer would pay a willing seller.” New Brunswick, supra at 543, 189 A.2d 702. Until a sufficient number of samplings have been examined to establish a definite trend from which a reasonable conclusion can be drawn, this answer cannot be given. It is to be noted that in Turteltaub’s example, the receiving land was unimproved as to water and sewer. When the approved total development was *50 sold as a project it resulted in a much higher unit sales price. Query: Suppose the receiving land in question had all off-site improvements fully installed, would the percentage be of the total value as improved or should those costs first be deducted? To answer this question, would it not be important to determine whether the units to be transferred would increase the cost of off-site improvements? The answers to these questions have not been placed in evidence and can only be answered after a sufficient number of sales have occurred and been analyzed. Additionally, I have found as a fact that in Bernards Township, of the 600 or so transferable rights created, 40 cannot be utilized. Would this not reduce the percentage value in any negotiations between a willing seller and a willing buyer?
It is to be noted that Turteltaub ascribed no value to the subject’s remainder after its transfer of the development rights, which conclusion I do not accept. After transfer of all development rights, although no housing may be developed on the remainder, the land can be utilized for other purposes. Admittedly, the remaining uses are limited; however, the remaining land does have a value. Englewood Cliffs v. Allison Estate, 69 N.J.Super. 514, 174 A.2d 631 (App.Div.1961). He has completely ignored the effect of the Clark sale which was located totally within the flood zone. As heretofore noted, like Murray he also appraised the subject property under the mistaken assumption that it was fully within the flood zone. The subject property has approximately one acre of upland which presumably could be used for a church or farm homestead with the balance of ground utilized as a buffer, farm or a similar use. Furthermore, it is unclear whether this one acre upland tract is included within the provision that provides for 5% units an acre, and whether this acre could receive one of the wetland development rights. From the evidence submitted, I conclude that upon a sale of the subject property’s development rights, the remainder (excluding the one acre upland) has a minimum value of $1,200 an acre. However, by reason of Murray’s failure to adequately support his adjustments of the Clark sale, I am unable to arrive at any determination of the remainder’s true value. Based upon *51 the conclusions in Sage, the upland should have a value of $5,000 per developable unit.
N.J.S.A. 54:4-23 requires an assessment of the value of the land; “the assessed value of the land represented the value of all interest in the land.” Stack v. Hoboken, 45 N.J.Super. 294, 300, 132 A.2d 314 (App.Div.1957). [Emphasis supplied]. Since I have been unable to ascertain the value of the transfer rights of the wetlands tract or its remainder and because insufficient proofs have been placed in evidence relating to the number of units that can be placed on the one-acre upland, I am unable to conclude a total value of the subject property.
In appeals to the Tax Court there is a presumption that a judgment entered by a county board of taxation is correct. Riverview Gardens v. North Arlington, 9 N.J. 167, 87 A.2d 425 (1952); Glenwood Realty Co. v. East Orange, 78 N.J.Super. 67, 187 A.2d 602 (App.Div.1963). This presumption stands until it is overcome by sufficient competent evidence to prove a true valuation different from the assessment appealed from. Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 89 A.2d 385 (1952); Spiotta Bros. v. Mine Hill Tp., 1 N.J.Tax 42 (1980).
In Aetna it was stated:
The settled rule is that there is a presumption that an assessment made by the proper authority is correct and the burden of proof is on the taxpayer to show otherwise. [Citation omitted]. And the taxpayer has not met this burden unless he has presented the appellate tribunal with sufficient competent evidence to overcome the presumption, that is, to establish a true valuation of the property at variance with the assessment, [citation omitted]. In other words, it is not sufficient for the taxpayer merely to introduce evidence: the presumption stands until sufficient competent evidence is adduced to prove a true valuation different from the assessment. Such evidence must be definite, positive and certain in quality and quantity to overcome the presumption.... [10 N.J. at 105, 89 A.2d 385; citation omitted]
By reason of taxpayer-expert’s failure to give any consideration to the subject property’s transfer development rights, he has not valued the total fee interest of the subject property. Therefore, I reject his value of $1,200 to $1,500 an acre. By reason of the comments I have made concerning defendant-expert’s evaluation, I likewise cannot accept his total value.
*52 The burden of proof is upon plaintiff to establish by a preponderance of the evidence that the assessment appealed from is incorrect. A plaintiff, by asserting in his complaint facts which, if proved, establish a basis for relief, has the burden of proving these facts. 29 Am.Jr.2d, Evidence, § 128 (1967). I conclude that plaintiffs have failed to meet this burden. Accordingly, their complaint must be dismissed.
Judgment will be entered accordingly.