LARIO, J.T.C.
Plaintiffs appeal from judgments of the Somerset County Board of Taxation which affirmed 1980 tax assessments made by Bernards Township on three of plaintiffs’ lots.
This matter is a companion case to the appeal of Lorenc v. Bernards Tp., 5 N.J.Tax 39, concerning an adjacent parcel, wherein the parties are respectively represented by the same counsel. These two cases were not consolidated for trial; however, by reason of their close physical proximity and the similar questions of law involved, it was stipulated and approved by the court that these cases be tried consecutively and that all evidence produced in Lorenc would be incorporated herein except as to those areas of valuation which by their very nature are not interchangeable.
In both this and the companion case plaintiffs allege that the assessor markedly increased the 1980 assessments based mainly upon the subject properties’ rezoning from minimum three-acre dwelling lots to multi-family, and also by reason of its rumored sale. They complain that since the new zoning ordinance did not receive its final reading and approval until October 2, 1979, one day after the assessing date, and, since the agreement of sale was dated October 17, 1979, which was also after the assessing date, the assessor had no legal reason for increasing the assessments. Plaintiffs urge that the new assessments were discriminatory and arbitrary and they request that the assessments “must be returned to where they were on the day before October 1, 1979.”
*57 The three lots under appeal are located in Block 182 and are mainly[1] vacant land, totaling 292.80 acres. They were assessed for the tax year 1980 as follows:
(a) Lot 18 4.30 acres
(b) Lot 28 113.09 acres
(c) Lot 33 175.41 acres
Total 292.80
$ 72,000
$1,077,000
$2,175,000
$3,324,000
In support of their respective valuation claims plaintiffs produced as their expert James Murray, who valued the properties at $702,720 based upon a per acreage value, while defendant’s expert, Richard D. Turteltaub, valued the properties based upon the ability to develop 1,222 housing units at $5,000 a unit, which he then apportioned to the lots to arrive at $5,485,000.
The lots under appeal, together with various other lots in the township, were the subject of much zoning litigation for many years, the subject properties having been involved since 1972.
By judgment dated March 29, 1974 in a suit instituted by one of plaintiffs’ predecessors in title, it was ruled that the municipality’s three-acre minimum lot size zoning in the southeastern quadrant of the township (which included the subject properties) was invalid. As a result of this ruling an amendment to the zoning ordinance was adopted in September 1974. Plaintiffs, objecting to the delineations contained in the amendment, instituted a new suit challenging the zoning ordinance as amended.
By judgment dated January 23, 1978 the township was ordered by Judge Leahy to further amend its zoning ordinance relative to this area as follows:
1. To permit utilization of either public or private sewage treatment and disposal in a manner compatible with applicable State and Federal regulations and requirements.
2. To permit development of Planned Residential Neighborhoods at densities of six dwelling units per Gross Site Area Acre in the PRN-6 zone and eight dwelling units per Gross Site Area Acre in the PRN-8 zone. The definition of Gross Site Area shall be as set forth in Ordinance # 347 as adopted September 3, 1974.
*58 3. To delete discretionary authority granted municipal boards and substitute therefor language granting the right to an applicant to receive necessary permits upon satisfying objective criteria expressly enumerated in the ordinances.
Various appeals and cross-appeals from these judgments and other related zoning judgments were pursued, after which the Appellate Division remanded the appeal covering the subject property to the trial division. There, based upon a decision of Judge Leahy dated March 13, 1979,
... a judgment was entered which indicated that this Court would appoint an impartial zoning and planning expert who would be directed to file a report and testify as to a recommendation for the achievement by defendant, Bernards Township, of compliance with the Court’s direction to appropriately increase the number of dwelling units per site acre.[2]
Finally, as stated by plaintiffs’ counsel, “After a number of forays into the Appellate Division by both parties and a denial of a motion by the Township of Bernards for leave to appeal to the Supreme Court, Judge Leahy entered an order for supplemental judgment” on May 10, 1979. This order was a consent decree entered by reason of a compromise reached between the parties for the purpose of bringing this litigation to a conclusion, which it effectively accomplished.
The effect of this consent judgment was that Bernards Township would amend its zoning ordinance to increase the permitted number of dwelling units per acre in the PRN zone which specifically affected the lands in question. Relative to the issues in this case, it included the following:
5. The proposed zoning amendment shall include the following provisions and considerations...
(f) Multi-family dwellings shall mean studio apartments, one-or-more bedroom garden apartments and townhouses as well as duplex units and twinhouses.
(g) The proposed ordinance shall contain development regulations relating to transition zones, open space, parking and other normal development regulations, none of which shall be unduly cost generating nor result in the reduction of the number or type of units otherwise permitted.
6. ...
*59 (c) Within 45 days of the entry of this judgment, the Township Planning Consultant or Consultants, Marshall Frost and Peter Abeles will prepare a development plan for the Sage property incorporating the following factors:
(1) The plan will consist of 1,222 units, 1,016 of which will be multi-family, 206 of which will be single-family residences.
(2) The development plan will provide access from the site to both Acken Road and King George Road and will include but not be limited to road and parking layout; drainage pattern and detention requirements; utility plan; provision for recreation; multi-family dwelling unit-types and location; single-family lot lines; transition zones; general grading and landscaping.
(3) The plaintiff shall have the right to have a planner of their choice consult with the Township Consultant in the preparation of this development plan. Upon completion of the development plan, plaintiffs [Sage, et al’s property] shall have the right to construct the number of units as set forth herein and as shown on such plan. Prior to construction, plaintiff shall submit to the Planning Board all necessary documents for site plan review, the submission and review of such documents shall be accomplished without undue delay, shall not be inconsistent with the said development plan and shall not result in the reduction of the number of units to be permitted as shown on said approved development plan.
(d) The Township will approve the construction of a package treatment plan for the development plan which shall be consistent with Ordinance # 495 relating to individual sewage systems.
(e) This judgment as it affects the development of the Sage properties will run with the land and may not be changed or modified by any future ordinance of the Township until completion of development.
Thereafter the township consultants met with and cooperated with plaintiffs’ agents to prepare the form of the required zoning amendment in compliance with the consent judgment. After several months an agreed amendment was presented which was accepted by the municipality. It had its first reading by the municipality in August 1979, and its final reading and adoption occurred at the meeting of October 2, 1979.
The township’s assessor testified that by reason of Judge Leahy’s final consent judgment of May 10,1979, as of October 1, 1979 (the assessing date herein) he considered the subject property to be rezoned; therefore, he valued the subject property based upon its use and ability to construct 1,222 housing units. Although his valuation date was October 1, 1979, he actually calculated his assessment of all the properties within this zone which he reassessed, between the beginning of August and end of December 1979.
*60 The assessor further stated that between late summer and early fall 1979, brokers, realtors, appraisers and other persons visited his office inquiring about these and the other properties affected by the consent judgment. He had extensive discussions with them and also with various township employees and newspaper reporters concerning these properties. It was during this period that he heard reports of the proposed sale of the subject property. Since multi-family zoning, as permitted by the judgment, was a new zone within the township, no comparable properties existed within Bernards Township. In arriving at his final conclusion of value he relied not only upon information acquired from the aforesaid discussions, but also upon his knowledge of sales for multiple-family use which he acquired from examining sales in other municipalities.
The final consent order affected approximately 1,800 acres. About two-thirds of this acreage is either land owned by exempt organizations, land which enjoys farmland assessments, or lots larger than one acre that had residential improvements thereon.
The assessor denied that he singled out for reassessment the properties of those plaintiffs in the zoning suits. He stated that he reassessed all those properties which were affected by the court’s order, leaving out all exempt property, those lands which enjoyed a farmland assessment and all properties that had residential structures on them. He eliminated the latter by reason of his interpretation of N.J.S.A. 54:4-23.24[3], which he understood to preclude an assessor from reassessing a residential property that has been rezoned to commercial. He stated that since multiple-family units are synonymous with apartments, they are both classified by the Division of Taxation as Class 4-c *61 property for assessment purposes, which is a commercial designation.
As proof that he did not discriminatorily reassess plaintiffs’ properties, he pointed out that although plaintiffs owned five parcels affected by the court’s order, because two of the tracts had residential structures on them he did not reassess those two tracts.
From the evidence adduced I find that the assessor reassessed plaintiffs’ properties for the reasons testified to by him and that plaintiffs have not proved that the assessor arbitrarily and unlawfully changed their assessments. In Tri-Terminal Corp. v. Edgewater Boro., 68 N.J. 405 (1975), our Supreme Court stated:
. .. The law calls for the separate assessment of each parcel annually at its true value on the assessing date. [Citation omitted] While practicalities obviously preclude most assessors reviewing every assessment line item every year, [Citation omitted] there should nevertheless be alertness to change valuation factors peculiarly affecting individual properties in years between revaluations and requiring prompt revision of such assessments in fairness to the particular taxpayer or to the taxing district. [Citation omitted]. It should be obvious that, absent such attention, the carrying over of assessments each year from one general revaluation to the next is not the proper discharge of the assessor’s function [at 413 — 414],
Although plaintiffs have failed to prove their factual allegation on this issue, even if they had it would not be sufficient to establish a cause of action for unlawful discrimination nor would it entitle plaintiffs to the relief in the form they requested. See, Continental Paper Co. v. Ridgefield Pk., 122 N.J.Super. 446, 300 A.2d 850 (App.Div.1973), certif. den. 63 N.J. 328, 307 A.2d 101 (1973) and Murnick v. Asbury Park, 187 N.J.Super. 455, 455 A.2d 504 (App.Div.1982) for the evidence required to establish a cause of action of unlawful discrimination in assessement practices and the relief to be granted.
Plaintiffs claim that since the new zoning ordinance was not finally adopted until after the assessing date and since there was no recorded deed transaction prior thereto establishing value, the assessor had no basis for and he was mistaken in his action in reassessing the subject properties. They also allege that the actual record change in assessment was not made until after October 17, 1979. For those reasons they assert that since no basis existed for the assessor’s reassessment, “his selection of *62 one price rather than another as the new assessment is not reached and becomes moot.”
Plaintiffs’ conception of the law of assessments is incorrect. “[T]rue value is still . .. the foundation for property assessments in New Jersey.” Passaic v. Gera Mills, 55 N.J.Super. 73, 82, 150 A.2d 67 (App.Div.1959), certif. den. 30 N.J. 153, 152 A.2d 171 (1959).
N.J.S.A. 54:4-23 directs that the assessor shall “determine the full and fair value of each parcel of real property ... at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1.... ”
There is no requirement that an assessor must physically record all his line item assessments on October 1 of the pre-tax year. By N.J.S.A. 54:4-35 the assessor shall determine his taxable valuations of real property as of October 1 in each year and he is required to complete and file his assessment list with the county board by the following January 10. This section specifically contemplates that the assessor has between October 1 and January 10 to make any and all changes and corrections in assessments; however, the valuation date remains as of October 1 of the pre-tax year.
Our former Supreme Court interpreted N.J.S.A. 54:4-23 in New Jersey Bell Tel. Co. v. Newark, 118 N.J.L. 490, 193 A. 844 (1937), aff’d 124 N.J.L. 451, 12 A.2d 675 (E. & A.1940), wherein it held:
the price which the assessor believes could be obtained for the property, in money, at a fair sale, as of the first day of October of the year in which the assessment was made, between a willing seller and a willing buyer; that is, one not obliged to sell dealing with one not obliged to buy. [118 N.J.L. at 494,193 A. 844, emphasis supplied]
The local assessor has the authority to use his knowledge and judgment in valuing taxable property. D., L. & W.R.R. Co. v. Hoboken, 16 N.J.Super. 543, 549, 85 A.2d 200 (App.Div.1951), rev’d on other grounds 10 N.J. 418, 91 A.2d 739 (1952), and nowhere in the law is he confined to base his value on recorded deed transactions.
*63 On appeal to this court from a judgment of the county board a de novo hearing is held “in which the ultimate fact sought to be determined is the full and fair value of the property.” Rek Investment Co. v. Newark, 80 N.J.Super. 552, 557, 194 A.2d 368 (App.Div.1963). Therefore, the primary issue before this court is to determine the market value of the subject lots as of October 1, 1979.
In discussing this issue this court observed in Berkeley Develop. Co. v. Berkeley Heights Tp., 2 N.J.Tax 438 (1981):
The search is for the true value of the property — specifically the price a willing buyer would pay a willing seller. Consideration may be given to reproduction, sales of comparable property and to rental income. New Brunswick v. Tax Appeals Division, 39 N.J. 537, 543 [189 A.2d 702] (1963). There is no single doctrinaire approach to valuation of real property. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 72 [208 A.2d 153] (App.Div.1965). “The answer depends upon the particular facts and the reaction to them of experts steeped in the history and hopes of the area.” New Brunswick, supra [39 N.J.] at 544 [189 A.2d 702] [at 442]
In arriving at his conclusion of value Mr. Murray valued plaintiffs’ property based upon a per acre basis. He considered two sales of vacant land, both of which occurred prior to 1979. He did not consider his second sale, identified as the Clark sale, to be comparable but only as similar. The only similarity of this latter sale, which occurred in August 1978, was that it is vacant land. Aside from its negative time factor, it is located completely within the Special Flood Hazard Zone, therefore unbuildable. Its sales price can be given no weight in determining the value of the subject properties.
His remaining sale, referred to as the Grigsby sale, occurred on May 16,1978. The property consisted of a residence plus 211 acres, 181 of which were in Bernards Township and 30 contiguous acres in Warren Township. It sold for $500,000, plus life rights. The seller was a widow who reserved unto herself a life estate in the residence and two acres.
Although Murray stated he had familiarized himself with the final consent judgment of May 10, 1979, since the new zoning ordinance had not been completely adopted and because approval for 1,222 units had not been received by October 1, 1979, he stated he could not utilize the judgment in arriving at his value.
*64 He alleged that the Grigsby property had the same zoning as the subject property, but when he was pressed to explain exactly what housing was permitted to be built under that zoning, he admitted he did not know. When asked if he had verified the sale he said he had not, stating he had secured all his information concerning this sale from the deed. He did not know if Mrs. Grigsby had any financial pressure that required her to sell, nor did he investigate any other circumstances of this sale; nevertheless, his final conclusion of value was in total reliance upon this sale. Since the total acreage of this sale was 211 acres, he divided the $500,000 consideration thereby, arriving at a per acre value of $2,370 which he rounded to $2,400. In reliance upon this data, he concluded that plaintiffs’ property was worth $2,400 to $2,500 an acre and he utilized the $2,500 figure.
The township’s expert testified that in arriving at his conclusion of value he gave special weight to the final judgment of May 10, 1979 which granted plaintiffs the right to construct 1.222 units. It was his opinion that the order of May 10, 1979 ended the speculative nature of what could be developed and it established firmly the use to which the subject properties could be put. By reason of specific details in the judgment concerning the subject properties, he concluded that the right to build the 1.222 units was complete as of the date of its entry and that subsequent zoning passed by the municipality detailed the order but did not change it.
Based thereon, it was his opinion that the highest and best use of the subject property as of October 1, 1979 was for the development of multi-family and/or single-family development to the extent permitted by the order, and that it was more than reasonably probable to any prospective purchaser on October 1, 1979 that this property could be used for the development of 1.222 units of residential housing. It was his conclusion that in determining the sales price of the subject properties both the owners and prospective buyers would utilize a per unit value.
*65 In accordance therewith, it was his opinion that by reason of the continuous zoning litigation up to the entry of the final judgment, the use, development conditions and the number of units permissible, of all the property within this area were highly speculative. Therefore, any sales occurring prior to May 10, 1979 could be given little weight as to their comparable value. He disregarded the Clark sale for the additional reason that it could not be developed for multi-family use and he gave no weight to the Grigsby sale because of the highly doubtful zoning as of the date of sale and the special circumstances of the sale. In verifying the Grigsby sale he was advised by the broker involved that the broker had appraised the property, by reason of the zoning problems taking place, at $1,500,000, and he had an offer of $1,400,000 which he discussed with Mrs. Grigsby. He stated that she had a chronic heart condition and was without funds, having inherited from her husband the farm but not the business. The latter, apparently, had been given to his employees. She had no means to support the farm and she was concerned that she could not continue to work as a physical therapist, which was her profession; she required immediate relief from her financial problems and she apparently sold the property for the reduced price because it closed within 60 days and permitted her to remain on the premises. The broker was of the opinion that the property was worth considerably more, and he commented that when one bought a piece of property in Bernards Township in 1978 all one was buying was a lawsuit.
In arriving at his opinion of value Turteltaub relied upon five sales of land zoned for multi-family dwelling units. His first sale sold for $7,857 a unit; the second, $8,190 a unit; the third, $7,927 a unit; the fourth, $6,765 a unit, and the fifth, $12,500 a unit. After making adjustments for variations, such as time of sale, size, location, topography and off-site improvements, he lowered the indicated unit value of each sale by 30%, 33V3%, 50%, 25% and 60%, respectively. Based thereon, he concluded that the unit value for the subject property by way of the comparable market sales approach was $5,000.
*66 During plaintiffs’ presentation, their counsel elicited testimony that the subject property was under an agreement of sale dated October 17,1979 for a consideration of $10,000,000, subject to pre-closing conditions. In defendant’s presentation (over plaintiffs’ objections) the contract of sale was permitted to be placed in evidence. Plaintiffs object that the contract is inadmissible because it was executed after the assessing date of October 1, 1979.
Plaintiffs do not cite, nor are we aware of, any rule of law which precludes the receipt of evidence of a sale of the subject property occurring shortly after the assessing date. The issue concerning the time of sales, generally, was fully explored by Judge Andrew in Almax Builders, Inc. v. Perth Amboy, 1 N.J.Tax 31 (1980), wherein he held (at 37), “So long as a proffered sale is not remote, the sale should be admitted for its rational probative valuation inference.”
The sale agreement in question is for the. conveyance of the very properties under appeal, and the main issue herein is the properties’ market value as of October 1,1979. The agreement, which from all appearances was between a willing seller and a willing buyer, was dated but 17 days after the critical valuation date. No competent proofs were adduced to establish that there was any change in value for this property between the 1st and 17th of October. If, as plaintiffs urge, all legal formalities must have been completed before the development of 1,222 units could be considered, it is to be noted that the planning board did not give its final approval for the site plan until December 1979; therefore, no change occurred even under their incorrect theory.
In L. Bamberger & Co. v. Tax Appeals Div., 1 N.J. 151, 62 A.2d 389 (1948), the issue involved was the probative weight given by the Division to a sale of plaintiff’s property which was under appeal. The assessment dates involved were October 1, 1944 and October 1, 1945, respectively. The property was sold in December 1945, which was 15 months and 3 months after the respective assessing dates. The court was definitely aware of the dates involved, noting in its opinion (at 153, 62 A.2d 389) *67 that the sale was “subsequent, as will be observed, to the assessing dates.” There was no question but that the sale was admissible in evidence, the only issue being the weight to be accorded it. See S. Hird & Son, Inc. v. Garfield, 87 N.J.Super. 65, 208 A.2d 153 (App.Div.1965).
I conclude that the agreement of sale of the subject property, being between a willing buyer and a willing seller, cannot be excluded from consideration solely because it was executed 17 days after the assessing date. However, the weight, if any, to be afforded the sale must depend upon all of the facts and circumstances surrounding it. A bona fide sale of the subject property may be indicative of its true value, but it is not controlling. North Bergen Tp. v. Bergen Blvd. Holding Co., 133 N.J.L. 569, 45 A.2d 623 (E. & A.1946).
The terms of the agreement, briefly stated, include a purchase price of $10,000,000, payable $100,000 upon execution; $300,000 during the period commencing November 15, 1979 and ending November 12, 1981, payable at a rate of $12,500 a month; $1,200,000 upon closing and $8,400,000 in the form of a mortgage bearing no interest but requiring payments of $500,000 a year.
The buyers’ obligation to purchase is conditioned upon their receiving a final approval for subdivision for 1,222 units; site plan and building plans; installation of sewer facilities; adequate utilities and any and all other governmental applications required.
In the event all required final approvals have not been obtained by the purchaser on or before November 15,1982 the contract could be extended from month to month for a period not to exceed one year. If the contract closes, the purchase money mortgage requiring minimum annual payments of $500,000 (depending upon number of units constructed per year) will become due in seven years.
By reason of the many conditions and exceptionally unusual terms of the contract, Turteltaub stated that he did not consider the proposed purchase price to be indicative of its true value and by reason thereof he did not utilize it in arriving at his final *68 conclusion of value, but instead he viewed it solely for the purpose of corroborating his independently arrived at opinion.
By reason of the substantial number of contingencies, the seven-year, interest-free, purchase money mortgage and the fact that the closing was not scheduled within a reasonable time after its execution, this court views the contract mainly as an option agreement and I conclude that its purchase price has no probative value. Cf. Olin Mathieson Chem. Corp. v. Paulsboro, 3 N.J.Tax 255, 262 (1981). The contract’s sole value is its corroborative indication that property such as the subject is usually sold and purchased in the marketplace based upon a per unit value, provided it can be ultimately developed.
In order to determine the full and fair market value of the lots as of October 1, 1979, we must find the price a willing seller and a willing purchaser would agree upon. An expert witness as to value is permitted to base his opinion on those sources of information to which business men usually resort. He
.. . should consider the same elements as would willing and intelligent buyers and sellers; he may rely upon the same sources of information that they would use. As Chief Judge Parker pointed out in U.S. v. 25,406 Acres of Land, 172 F.2d 990 (4th C.C.1949), since the court adopts the standards of the market place in making valuations, there is no reason why it should close its eyes to how the market place arrives at and applies the standards. [D., L. & W.R.R. Co. v. Hoboken, supra 16 N.J.Super. at 557, 85 A.2d 200]
Valuations must be formed upon what was known and reasonably anticipated as of the assessing date. New Brunswick, supra 39 N.J. at 545, 189 A.2d 702.
Plaintiff presented the testimony of Marshall Frost, who stated that at one point he was the township engineer and at present is the consultant to the planning board. He produced the concept plan for the subject property arid testified that it was prepared by his firm with the assistance of plaintiffs’ architect involved on the project. This plan was the one obligated by the terms of the final judgment of May 10, 1979. He stated that although the judgment required the plan to be completed within 45 days, the plan was actually completed in *69 September or October; however, because of scheduling problems of the planning board it was not finally approved by the board until December 17, 1979.
Asked about the delay, he responded, “There was input by both my firm as well as your [plaintiffs’] expert. Your expert and I took a fair amount of time to try to get the plan so that everybody was satisfied — it took that period of time. At that time there was no objection that I know of raised with the court.... ” One of the purposes of preparing the plan in advance was that they wanted to make sure that the ordinance finally adopted would be satisfactory to plaintiffs “so that the ordinance wouldn’t all of a sudden preclude the 1,222 units that [plaintiffs] received when we all entered under the court order.”
During the course of the development of this plan Frost discussed it with the assessor and others. At the request of plaintiffs’ architect, he met with a number of realtors and potential purchasers of the property. They inquired about the technical problems relating to the building project because of the history of the litigation, to find out if there would be a problem with the town and the impact of the plan. He stated to them that he knew of no reason why 1,222 units would not be placed on the subject lots. These discussions occurred between May 10 and October 1, 1979.
It is clear from Frosts’s testimony plus other evidence presented that the judgment of May 10,1979 was accepted as a finality by all parties involved immediately after its entry and that the development plan as specified in the order would be honored by the municipality and eventually given full effect. As of the late summer and fall of 1979, and specifically on October 1, this finality of zoning was believed to be an accomplished fact by plaintiffs and realtors generally.
In State v. Gorga, 26 N.J. 113, 138 A.2d 833 (1958), a condemnation case, the specific question involved was whether the market value of the property therein condemned as of the date of taking may be affected by the prospect of an amendment of the zoning ordinance. Chief Justice Weintraub, speaking for the court, stated:
*70 It is generally agreed that if as of the date of taking there is a reasonable probability of a change in the zoning ordinance in the near future, the influence of that circumstance upon the market value as of that date may be shown, [at 116, 138 A.2d 833, citations omitted]
In short if the parties to a voluntary transaction would as of the date of taking give recognition to the probability of a zoning amendment in agreeing upon the value, the law will recognize the truth, [at 117, 138 A.2d 833]
In the present case the court’s order not only was agreed to by the municipality but by its subsequent actions it was fully accepted, and all officials and employees were publicly cooperating to put the order into effect. Although the ordinance and the concept plan had not been officially adopted by October 1, it was far more than a “reasonable probability” of a change in the zoning ordinance. By reason of the consent decree it was, in effect, an accomplished fact. Since the court order further directed that the township could not change or modify the agreement reached by any future ordinance until completion of the development, and that the development rights on the subject properties ran with the land, the agreed order was stronger and more valuable to a developer than even an adopted ordinance, which, under ordinary circumstances, could be changed by amendment. Therefore, sellers and buyers of land in this zoned area would consider the uses directed by the court’s final order as the zoning in place on October 1, 1979. Accordingly, the subject properties would be so valued. I therefore find that the proper method to value the subject properties is the utilization of a per unit sale value.
Up until the time the consent decree was entered into there were continual attempts by the municipality to restrict the zoning and continual attempts by the property owners to receive more liberal zoning. Since all decisions up until May 10, 1979 were constantly under appeal, what could be developed on vacant, large tracts of land during that period was extremely doubtful and highly speculative. Even plaintiffs’ expert, who presumably prepared himself in advance to testify on this crucial issue, was confused as to the correct zoning affecting his comparables as of the respective dates of their sale. This doubt *71 and confusion unquestionably existed in the marketplace even after Judge Leahy’s opinion of January 23, 1978, which was appealed immediately, and it continued until the consent judgment was entered. This unsettled situation definitely had a depressing affect on land values; therefore, any sale of similar property in this zone prior to May 10, 1979 can be given very little probative weight.
Murray testified that prior to his appraisal he had been made aware of the zoning history and the consent order. With an expert having all these facts called to his attention, it is difficult for this court to understand how that expert could, as of October 1, 1979, ignore the value of the development rights for 1,222 units as set forth in the proposed ordinance which was scheduled the next day for final adoption. A property’s permissible uses under a zoning ordinance bear crucially upon its value. Overpeck Land Corp. v. Ridgefield Park, 104 N.J.L. 402, 140 A.300 (E. & A.1928).
I find Murray’s conclusions of value were not based upon market considerations and general knowledge existing as of October 1, 1979, pertinent to these properties, which are usually considered by sellers and buyers in the marketplace, whereas the facts and inferences relied upon by Turtletaub were so founded.
Plaintiffs object that the township’s expert failed to “uncover a comparable sale within Bernards Township in a zone which is quite similar and where the property is located within a flood plain similar to plaintiffs’ properties.” Since I have accepted the theory that the subject properties’ value is properly based upon a “per unit” value, it is not necessary, for a sale to be considered as a comparable that the property be located within a flood plain. The main similarity to be sought is whether the sale property offered as a comparable can be developed with multi-family housing units. Therefore, although the fifth comparable sale used was not in a flood plain, it is located within Bernards Township and zoned PRD-1, permitting cluster development; hence it is certainly deserving of consideration.
*72 Also, since the zoning created by the consent judgment was a new zoning within the township, it obviously became necessary to look outside the municipality for additional comparable sales. In defendant’s appraisal report this area was described as follows:
The subject property lies within, what has been described in the New York Times as, “the fastest growing suburban market in the metropolitan area.”
All of the subject area’s commercial development has created and will create a demand for housing that should continue on into the next decade. Bernards Township, with a good reputation as a residential community, is well situated within this growth area... .
Based thereon I conclude that, in attempting to ascertain values, a prospective purchaser would rely upon sales in the general geographical area; therefore, I do not consider the sales offered by defendant to be remote.
After considering all of the evidence presented and weighing the testimony of the respective experts, I find that the opinion and conclusions arrived at by defendant’s expert far outweigh those proposed by plaintiffs’ expert. The determination of the weight to be given to the testimony of an expert witness depends not only on his candor, intelligence and experience but also on the facts and reasoning which form the foundation of the expert’s reasoning. Passaic v. Gera Mills, 55 N.J.Super. 73, 150 A.2d 67 (App.Div.1959), certif. den. 30 N.J. 153, 152 A.2d 171 (1959); In re Port of New York Auth., 28 N.J.Super. 575, 101 A.2d 365 (App.Div.1953).
I conclude that the fair market value of the subject property is based upon its use as a multi-family and single-family development and that each development right has an average value of $5,000 per unit.
Plaintiffs own five separately assessed lots whose total acreage was the basis of the consent order permitting the development of 1,222 units; however, the assessments on only three of these lots have been appealed. The consent decree and the overall plan for the development considered plaintiffs’' five *73 lots, consisting of 326 acres, as a total entity, and the number of the approved units was based upon plaintiffs’ total acreage. The location of the proposed units extends across plaintiffs’ lot lines without consideration of them. Where several properties are assessed separately but valued as a unit, to determine the validity of the assessments the total assessments and their total value are to be compared in their entirety and not prorated. In re Appeals of Kents, 34 N.J. 21, 33-34, 166 A.2d 763 (1961); L. Bamberger, supra at 158, 62 A.2d 389; Springfield Tp. v. Weinberg, 178 N.J.Super. 83, 428 A.2d 115 (App.Div.1981).
The overall plan for the development permits of approximately 3.75 units an acre, calculated to 1,098 units for the 292.80 acres. Based thereon I conclude that the correct fair market value of plaintiffs’ three lots under appeal totals $5,490,000.
Under N.J.S.A. 54:2-40.4 (popularly referred to as Chapter 123), the 1980 ratio applicable to Bernards Township is 57%. Since the total assessment levied falls within the common level range, plaintiffs are not entitled to any relief under this statute.
Judgment will be entered affirming the county board’s judgments.

Throughout the trial the lots were referred to as vacant land; however, defendant-expert’s written appraisal refers to. a $100 improvement assessment which does not appear in the pleadings.

As described in Judge Leahy’s order for judgment of May 10, 1979.

N.J.S.A. 54:4-23.24, the validity of which is not at issue here, provides: All property which has been valued and assessed as residential property within a zone designated as residential and which has been so assessed . for a period of 3 years or longer, and which upon the revision of a zoning ordinance becomes situate in a commercial or industrial zone, shall continue to be valued and assessed as residential property so long as the owner thereof at the time of the change in the zoning ordinance shall continue to occupy such property as his principal place of residence.