**NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS**

**TAX COURT OF NEW JERSEY**



MALA SUNDAR
JUDGE

Richard J. Hughes Justice Complex
P.O. Box 975
Trenton, New Jersey 08625-0975
609 815-2922, Ext. 54630 Fax 609 376-3018

July 29, 2020

Amber Heinze, Esq.
Pablo M. Kim, Esq.
Irwin & Heinze, P.A.
Attorneys for Plaintiff

David A. Ward, Esq.
Kluger Healey, LLC
Attorneys for Defendant

> Re: Dweck, David and Julienne v. Village of Loch Arbour
> Block 12, Lot 8
> Docket Nos. 000015-2017, 000083-2018, 000090-2019, 000020-2020

Dear Counsel:

This letter constitutes the court's decision following trial of the above-captioned matters.

Plaintiffs owns the above-captioned property ("Subject"), a 0.413-acre lot improved by a single-family home located in Defendant taxing district ("Loch Arbour"). For each tax year at issue, they appealed the Subject's local property tax assessment set forth below, and their real estate appraiser concluded the Subject's value as follows:

| Year | Assessment | Appraiser's Valuation |
|------|------------|----------------------|
| 2017 | $1,207,600[1] | $ 925,000 |
| 2018 | $1,419,200[2] | $1,175,000 |
| 2019 | $1,396,100[3] | $1,200,000 |
| 2020 | $1,778,700[4] | $1,400,000 |

Loch Arbour argued that Plaintiffs' appraiser's value conclusions should be rejected because (1) the appraiser did not make "market" adjustments for the significantly lowered tax

---

[1] Allocated $645,800 to land and $561,800 to improvements.
[2] Allocated $787,200 to land and $632,000 to improvements.
[3] Allocated $804,400 to land and $591,700 to improvements.
[4] Allocated $1,027,100 to land and $751,600 to improvements.






rate from 2017 onwards, which increased property values in Loch Arbour as a whole, and which market appreciation is evidenced by the appraiser's value conclusions increasing each year despite the absence of any improvements to the Subject during this time; (2) the sales comparison approach cannot be applied because each home in Loch Arbour is of a different style, and most homes are bought to be demolished and rebuilt; (3) the gross adjustments made by the appraiser were excessive; and (4) two of the three sales used for tax year 2020 were not sales but a swap with an arbitrary sale price. It supported these arguments with testimony of its assessor and one of the property owners involved in the alleged swap transaction.[5]

The court rejects Loch Arbour's first two arguments. It agrees with Loch Arbour that the two sales used in tax year 2020 were a swap, and thus, are not usable as comparables. The court also finds Plaintiffs' appraiser's lot size adjustments unpersuasive because he deemed the entire difference between a comparable's lot size and the Subject's lot size surplus land with a lower per-square-foot (PSF) value, which conflicts with his opinion that the Subject's buildable lot size merited a higher value than the area in excess of the buildable lot. The court cannot compute what the correct adjustment should be based on the evidence before it. Since each tax year required a lot size adjustment, and further since the appraiser also used the lower PSF value in computing his location adjustment, the court must affirm the assessments.

**SUBJECT DESCRIPTION**

The site is a level parcel of land (slightly above street grade) measuring 100x180 SF, with 100 feet of frontage on Euclid Avenue. Located in the R residential zone, it lies in the southeastern most portion of Loch Arbour. Plaintiffs' appraiser's reports for each tax year (admitted into evidence without objection) noted that the Subject was "legal" as to the zoning;

---

[5] Loch Arbour withdrew its counterclaims for each tax year on the record at the end of trial.

however, they did not include or incorporate the zoning ordinance. The appraiser testified that the Subject's buildable lot size is 12,500 SF, and the 100-foot lot frontage is the minimum required under the zoning ordinance; thus, the lot is not divisible, as of right or legally, into two separate lots.

To the Subject's south, half a block away, is Deal Lake, and to its east, five blocks away is the Atlantic Ocean. The Subject's neighborhood is a mix of styles and sizes from bungalows to professionally landscaped estate-styles on half-acre lots. Some older homes are bought for demolition and re-building. The Subject has good access to local highways.

The home on the site was built in 1947. Plaintiffs' appraiser opined its effective age as 25 years due to its average condition. The two-storied house has an unfinished attic, is colonial-styled, with a living room, dining room, den, kitchen, 3 bedrooms, and 2½ bathrooms (one with a hot tub). The gross living area (GLA) is 2,880 SF. The 1,200 SF basement is 75% finished (900 SF) with a large recreation room, a full bath, a laundry room, and a storage area. Amenities include a fireplace, a deck, an open porch, a screened porch, an attached two-car garage, and a brick driveway. Based on his personal inspection, Plaintiffs' appraiser opined that the improvements, although requiring deferred cosmetic repairs/maintenance, were in overall well-maintained but average condition.

**PLAINITIFFS' APPRAISER'S VALUATION**

Plaintiffs' appraiser opined that the Subject's highest and best use (HBU) as vacant was for the development of a single-family residence, and as improved, its current use.

The appraiser used home sales in Loch Arbour, obtaining the sale details and physical condition from the Multiple Listing Services (MLS), and verifying the same with realtors, a party to, or an attorney for, the transaction, public records, and exterior inspection. He testified that

the Subject is located in a somewhat unique (as in exclusive) community; thus, publicly marketed sales were limited but not absent. His reports noted that he was "able to view only a few" sales listed on the MLS in the "[S]ubject's price range," that he also reviewed "non-MLS and private sales," and that "research of market data indicated an inherent limited amount of available sales data of competing older homes from the subject's marketplace." He testified that since there were sufficient sales in Loch Arbour for each tax year at issue, he did not extend his search for comparable sales elsewhere.

For tax year 2017, he used the following four sales:

| Comparable | 403 Edgemont Dr | 407 Euclid Ave | 329 Euclid Ave | 106 Norwood Ave |
|---|---|---|---|---|
| Sale Price | $950,000 | $612,500 | $1,200,000 | $1,200,000 |
| Sale Date | 06/01/2016 | 11/19/2015 | 09/24/2015 | 11/20/2015 |

For tax year 2018, he used the following four sales:

| Comparable | 331 Euclid Ave | 408 Euclid Ave | 10 Evergreen Place | 112 Euclid Ave |
|---|---|---|---|---|
| Sale Price | $999,000 | $830,000 | $938,000 | $950,000 |
| Sale Date | 04/13/2017 | 04/08/2017 | 05/24/2017 | 03/03/2017 |

For tax year 2019, he used three of the four sales he used for tax year 2019 and one additional sale as follows:

| Comparable | 325 Edgemont Dr | 331 Euclid Ave | 408 Euclid Ave | 10 Evergreen Place |
|---|---|---|---|---|
| Sale Price | $1,500,000 | $999,000 | $830,000 | $938,000 |
| Sale Date | 11/13/2017 | 04/13/2017 | 04/08/2017 | 05/24/2017 |

For tax year 2020 he used the following three sales:

| Comparable | 416 Euclid Ave | 325 Euclid Ave | 4 Evergreen Place |
|---|---|---|---|
| Sale Price | $1,140,000 | $1,300,000 | $1,300,000 |
| Sale Date | 09/17/2019 | 11/15/2019 | 11/14/2019 |

He made adjustments for differences in lot size, location, GLA, basement finish, condition, fireplace, garage count, porch/deck, pool, and guesthouse/apartment. For lot size adjustment, he compared two vacant land sales in Loch Arbour as follows:

4

|  | Sale Price | Sale Date | Area | Price PSF | Zone | Ocean Proximity |
|---|---|---|---|---|---|---|
| 214 Euclid Ave | $915,000[6] | 12/19/16 | 15,075 SF | $ 60.70 | R | Two Blocks |
| 111 Euclid Ave | $829,000 | 08/13/18 | 7,500 SF | $110.50 | R | One Block |

Based on these sales, he deemed the Subject's site value to be $40-$50 PSF (or $800,000 to $900,000) since it was larger, but farther away from the ocean, and determined the value of surplus land to be the 45% differential in the sale prices of the two sales. This 45% when applied to his concluded value of the Subject's lot ($40-$50 PSF) equals $18-$22.50 PSF, but he used $25 PSF. He multiplied $25 PSF by the difference between the Subject's and comparables' lot sizes to determine the lot size adjustments.

For the two comparables with a view of Deal Lake, (403 Edgemont Drive and 325 Edgemont Drive), he extracted an adjustment by deducting the adjusted sale price of another comparable (4 Evergreen Place, without a water view), such adjustments being for differences in lot size, GLA and condition, from the unadjusted sale price of 325 Edgemont Drive (with water view), and attributed the $277,400 difference as a negative adjustment to properties with a view of Deal Lake.

For ocean proximity, he compared the unadjusted sale prices of sales (some of which were his comparables) located in Loch Arbour within a block of the ocean, and those located three-to-four blocks away. The difference in their average PSF sale prices was about 19%; thus, he reduced the sale price of a comparable closer to the ocean by -20%. He admitted that he did not adjust the sale prices for differences in lot size, GLA and condition as he had for extracting an adjustment for Deal Lake views. He made this adjustment to only 112 Euclid Avenue.

For the remaining items, he used the same methodology and data for each tax year by comparing the differences in the depreciated cost of the item between the Subject (deemed Class

---

[6] This includes the appraiser's estimated demolition costs since the property was improved with a single-family home when sold.

D, masonry veneer with good construction) and the comparable. Cost for each item was derived from the Marshall & Swift (M&S) August 2018 publication, to which he added the current and local multipliers at the same rate for each tax year (1.03, 1.17), and then depreciated it using the age/life method. When questioned about using the same multipliers for each tax year, he explained that he had checked the quarterly updates but since the differences were insignificant, he used the same multipliers each tax year. He used a 41.67% depreciation rate for the Subject based on its 25-year effective age and 60-year economic life, and different rates for a comparable depending on its condition (from the MLS pictures) and his opinion of its effective age.[7] The adjustments were as follows:

*Tax Year 2017*

| Comparable | 403 Edgemont Dr | 407 Euclid Ave | 329 Euclid Ave | 106 Norwood Ave |
|---|---|---|---|---|
| Sale Price | $950,000 | $612,500 | $1,200,000 | $1,200,000 |
| Site Size (SF) | 10,103 (+$197,425) | 11,250 (+$168,750) | 24,750 (-$168,750) | 15,000 (+$75,000) |
| Location | Lakeside/Waterview (-$274,000) | Residential | Residential | Residential |
| GLA (SF) | 3,714 (-$83,400) | 2,670 (+$21,000) | 3,192 (-$31,200) | 4,911 (-$203,100) |
| Basement | Full/Unfinished (+$11,466) | Full/Unfinished (+$9,000) | Full/Unfinished (+$25,848) | Full/Unfinished (+$7,740) |
| Condition | Good (-$117,500) | Average | Good (-$101,000) | Average |
| Fireplaces | 1 | 1 | 1 | 2 (-$6,000) |
| Garage | 2-car | None (+$15,000) | 2-car | 2-car |
| Porches/Deck | Porch/Patio/Deck | Porch/Patio (+$3,500) | Porch/Patio/EP | Porch/Patio/Deck |
| Pool | None | None | None | Inground (-$25,000) |

---

[7] For example, he deemed comparable 1 (tax year 2018) in good condition, so he gave it an effective age of 10 years but a 60-year economic life for a 16.67% depreciation which he applied to the base cost-new ($126 PSF x multipliers =$151.64 PSF) for a depreciated cost of $126.54 PSF. This, less the Subject's $94.90 PSF depreciated cost, or $31.63 PSF, when multiplied to the comparable's GLA (2,788 SF) gave a -$88,000 adjustment (rounded). He used the same method for basements but applied the difference of the depreciated cost to 75% of the basement area of each comparable as the Subject's basement was 75% finished.

For GLA, he used the base cost for a single-family home, of Class D with a masonry veneer in "good" construction "type" at $135 PSF , which with the current and local multipliers increased to $162.69, and at 41.67% depreciation provided a depreciated cost of $94.90, rounded to $100 PSF. This adjustment also factored in bathroom count.

| Other | Apt/Guest House (-$93,000) | Apt/Guest House (-$50,000) | Apt/Guest House (-$51,500) | None |
|---|---|---|---|---|
| Adj. Price | $590,991 | $779,250 | $873,398 | $1,048,600 |

### *Tax Year 2018*

| Comparable | 331 Euclid Ave | 408 Euclid Ave | 10 Evergreen Place | 112 Euclid Ave |
|---|---|---|---|---|
| Sale Price | $999,000 | $830,000 | $938,000 | $950,000 |
| Site Size (SF) | 11,250 (+$168,750) | 6,250 (+$293,750) | 6,600 (+$285,000) | 6,140 (+$296,500) |
| Location | Residential | Residential | Residential | Ocean Block (-$190,000) |
| GLA (SF) | 2,788 | 2,326 (+$55,400) | 2,631 (+$24,900) | 3,003 (-$12,300) |
| Basement | Unfinished (+$7,650) | Unfinished (+$8,226) | Unfinished (+$8,190) | Unfinished (+$13,617) |
| Condition | Above Average (-$88,000) | Average | Average | Average |
| Garage | None (+$15,000) | 1-car (+$7,500) | 1-car (+$7,500) | None (+$15,000) |
| Porches/Deck | Porch/Patio/Deck | Porch/Deck (+$3,500) | Porch/EP | Porch/EP |
| Adj. Price | $1,102,400 | $1,198,376 | $1,263,590 | $1,072,817 |

### *Tax Year 2019*

| Comparable | 325 Edgemont Dr | 331 Euclid Ave | 408 Euclid Ave | 10 Evergreen Place |
|---|---|---|---|---|
| Sale Price | $1,500,000 | $999,000 | $830,000 | $938,000 |
| Site Size (SF) | 9,432 (+$214,200) | 11,250 (+$168,750) | 6,250 (+$293,750) | 6,600 (+$285,000) |
| Location | Lakeside/Waterview (-$274,000) | Residential | Residential | Residential |
| GLA (SF) | 3,423 (-$54,300) | 2,788 | 2,326 (+$55,400) | 2,631 (+$24,900) |
| Basement | Unfinished (+$12,204) | Unfinished (+$7,650) | Unfinished (+$8,226) | Unfinished (+$8,190) |
| Condition | Good/Remodeled (-$139,000) | Above Average (-$88,000) | Average | Average |
| Fireplaces | 2 (-$8,325) | 1 | 1 | 1 |
| Garage | 2-car | None (+$15,000) | 1-car (+$7,500) | 1-car (+$7,500) |
| Porches/Deck | Patio/Sm/EP/Porch | Porch/Patio/Deck | Porch/Deck (+$3,500) | Porch/EP |
| Adj. Price | $1,250,599 | $1,102,400 | $1,198,376 | $1,263,590 |

### *Tax Year 2020*

| Comparable | 416 Euclid Ave | 325 Euclid Ave | 4 Evergreen Place |
|---|---|---|---|
| Sale Price | $1,140,000 | $1,300,000 | $1,300,000 |
| Site Size (SF) | 7,895 (+$252,625) | 11,250 (+$168,750) | 8,267 (+$243,325) |
| GLA (SF) | 1,770 (+$111,000) | 2,266 (+$61,400) | 3,573 (-$69,300) |

| Basement | Full/Finished | Unfinished (+$10,980) | Finished |
|---|---|---|---|
| Condition | Avg+Updated (-$56,000) | Avg+Updated (-$71,500) | Avg+Updated (-$145,500) |
| Adj. Price | $1,447,625 | $1,469,540 | $1,328,525 |

**ANALYSIS**

A party challenging an assessment has the burden (a) to overcome the presumption of correctness afforded a challenged local property tax assessment, and then, (b) to persuade this court, with credible, objective evidence, why the Subject is over-assessed; and what is or should be, the Subject's value. MSGW Real Estate Fund, L.L.C. v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). The presumption "stands, until sufficient competent evidence to the contrary is adduced." Township of Little Egg Harbor v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998).

Generally, for residential properties, a comparable sale analysis is used to determine value. Plaintiffs' appraiser applied that methodology and proffered his reasons for using sales in Loch Arbour, both of which were reasonable. Based on his analysis of those sales, the court finds that Plaintiffs have overcome their initial burden. This does not mean that the assessments should be reduced. Rather, the court will examine the evidence presented to decide whether changes in the assessments are warranted.

Loch Arbour argues that Plaintiffs' appraiser's value conclusions should be summarily rejected because he did not make upward adjustments to the comparables' sale prices for market appreciation although his own value conclusions increased each tax year evidencing such appreciation, and it is undisputed that no improvements or renovations were made to the Subject. Loch Arbour's assessor testified that the market was unstable but in a positive way, due to the local property tax rate's significant decline. The lower tax rate, he testified, was due to litigation

where Loch Arbour residents, who apparently paid a disproportionate share of the Ocean Township school district's taxes, had a reduced tax burden after Loch Arbour became part of another school district. Such litigation ended sometime in 2017, after which, per the assessor, Loch Arbour's tax rates were significantly lower.[8]

Plaintiffs argue that their appraiser already factored in a lower tax rate, hence his value increased each tax year. Plaintiffs' appraiser stated that a lower tax rate does not indicate market appreciation as that phrase is normally understood (i.e., due to an economic upswing), although it can influence buyer behavior in that buyers would consider buying homes where taxes are lower. Especially here, given the unique close-community nature of Loch Arbour, and buyer behavior therein (buying older homes to rebuild to suit owner needs/idiosyncrasies), tax rates do not equate to stable or unstable real estate markets. He also noted that the unadjusted sale prices of his one improved comparable which sold in 2016 (and used for tax year 2017), and all the improved comparables sold in 2017 (used for tax years 2018 and 2019) were in the range of $800,000 to mid-$1,000,000. Therefore, he stated, since the sales were close to or relatively close to the tax years in question, there was simply no need for time or market conditions adjustment for each tax year.

It is reasonable to posit that a lower tax rate would attract more buyers since a homeowner's overall expenses would be lower. Loch Arbour's claim that its dramatic decrease in tax rate sometime 2017 onwards can increase sale prices, and therefore warrant an adjustment

---

[8] The tax rates for school purposes were as follows:

| Year | Regional/District School Budget | Rate Per $100 of Regional School Budget | Rate Per $100 of District School Budget |
|------|------|------|------|
| 2015 | $2,028,038 | 1.355 | |
| 2016 | $2,148,418 | 1.450 | |
| 2017 | $1,347,521 | 0.845 | |
| 2018 | $ 642,522 | | 0.374 |
| 2019 | $ 546,233 | | 0.306 |

to pre-2017 sales is also reasonable. However, without proof in support of the assessor's theory (such proof being for instance, sale prices pre-2017 and post-2017, with the only difference attributable to the effect of the tax rate), or without details as to the methodology/quantum of making a tax rate effect adjustment, the court cannot reject outright any pre-2017 sale used by Plaintiffs' appraiser as a comparable sale based on just the assessor's rebuttal testimony.[9]

Loch Arbour next argues that all of Plaintiffs' appraiser's comparables are suspect due to a total lack of homogeneity in Loch Arbour. Thus, it is impossible to use a comparable sales approach for Loch Arbour homes, and therefore, the appraiser's conclusions are not credible. Loch Arbour points to the appraiser's report which noted that:

> It should be stressed here again, that no two homes in the immediate marketplace are truly alike. They all have a wide range of different styles and sizes, and vary in condition and proximity or walking distance to various houses of worship and amenities. Based upon the semi-closed nature of the subjects (sic) neighborhood/real estate market, each of these homes take on their owners (sic) individual personality and lifestyles.

It may be that each home in Loch Arbour is uniquely styled. However, because of the unique close-community nature of Loch Arbour, it is not unreasonable to also consider the sales therein because those sales create a marketplace for/in Loch Arbour. The appraiser's report notes this by stating that "marketability is not hindered due to the variety of different styles and sizes." In the absence of proof of any usable sale from competitive neighborhoods, the court cannot infer (1) they exist; (2) Deal and Allenhurst are automatically comparable competitive markets for the Subject with the same HBU and buildable lot size as Loch Arbour suggests; and (3) that Plaintiffs' appraiser deliberately chose to disregard them.

---

[9] Even assuming that the comparables used by Plaintiffs' appraiser which sold in 2015/2016, and those that sold in 2017/2019 were similar to each other in all significant aspects (i.e., all things remaining equal), their unadjusted sale prices do not appear to show market value increase due to the lower tax rates, and thus, do not evidence the tie-in of a lower tax rate to property value increase in Loch Arbour, as espoused by Loch Arbour.

Next, Loch Arbour argues, the appraisal for each year must be rejected because it is common knowledge that almost all residential properties in Loch Arbour are purchased to knock down the existing structure and rebuild luxurious large homes; thus, in essence, the sale prices are for land only, and therefore, the sales cannot be used as comparables. For instance, the assessor testified, a comparable (112 Euclid Avenue) which sold 03/03/2017 for $950,000, was gutted shortly post-sale. Although not deemed non-usable for purposes of sales ratio studies, he considered it non-usable to prove the Subject's market value since it was in reality a land sale. He claimed the home was in bad condition which is why it was listed for a lower sale price. He conceded that the assessment record, which was entered into evidence, noted the property as "In Fair Cond. All Orig Needs Update marketed on Mls. Full Market Exp," yet, he claimed, "fair" means poor, therefore the comments meant that the property was in a poor condition and in need of repairs/replacement. However, the MLS pictures (exterior and interior) attached to the appraiser's report belie this statement and do not evidence the alleged decrepit condition.

The assessor's other example was 329 Euclid Avenue, which he stated was knocked down after its purchase to make way for a much larger single-family home. He testified that the home on this property was demolished sometime in 2016 after its purchase in 2015, and permits were obtained for a new larger home which was built by the buyers in 2017. The "Property Detail" which was entered into evidence shows the GLA as 7,300 SF with the "year built" as 2017 (whereas the GLA in Plaintiffs' appraiser's report showed 3,192 SF when sold). The assessor agreed that the demolition had nothing to do with the home being in a poor or dilapidated condition but stated that it was due to lot size and its buildability. Therefore, and while his predecessor did not consider the sale as non-usable for purposes of sales ratio studies, the

11

assessor asserted that this property was not a credible comparable since it was bought to be demolished.

Plaintiffs' appraiser's report acknowledged that homes in Loch Arbour are sometimes bought to be demolished and re-built. For instance, his report states that "[o]ne must keep in mind many older homes like the subject are typically purchased for their land value, whereby individual homeowners construct their own private residence." It also notes:

> Older and remodeled, and large new custom built homes in the subject's marketplace are considered to be typical and common for the area however they do not sell or "turn-over" on a frequent basis. These homes take a special type of real estate agent to properly list and market them accordingly. Also, the type of buyer that would look for a home of this quality, design and location is not considered to be the typical purchaser in the general surrounding market. It takes a special buyer who is specifically looking for a unique older home with similar capital to support it.

Clearly, the parties agree that sometimes older homes are purchased to be rebuild larger new/custom homes regardless of the home's habitable (average or good) condition. Evidence shows that this happened with 329 Euclid Avenue. The problem is that the court is being asked by Loch Arbour to take a leap from these two instances and conclude that all properties in Loch Arbour are bought to be demolished and rebuilt, and therefore Loch Arbour sales reflect only land value. Consequently, per Loch Arbour, it cannot have or provide comparable sales of improved properties. The court, however, hesitates to make this leap without corroborative evidence that the buyer(s) did not pay fair market price for land and the existing improvement, for instance with testimony that the buyer paid only for land value due to the individual motivation to rebuild to suit the buyer's needs/idiosyncrasies, or testimony that the purchase price was only for a buildable lot, or testimony that the sale was not arm's-length, or proof that the sale deed allocated the entire purchase price to land and/or a nominal amount to

improvements. Therefore, the court will not reject the comparables in their entirety simply because some older homes are bought to be demolished and rebuilt into larger newer homes.

The court will now address the credibility of the comparables and adjustments. It rejects Plaintiffs' appraiser's comparables 2 and 3 for tax year 2020. Testimony adduced by Loch Arbour persuasively proved that these properties were never on, or exposed to the market, cash never exchanged hands, neither party to the swap wanted to actually sell or buy, and simply exchanged homes for an arbitrary price. This then leaves one sale for tax year 2020. Generally, one sale is insufficient to conclude a credible value determination because it cannot reasonably be considered representative of the general or entire market. See Lorenc v. Township of Bernards, 5 N.J. Tax 39, 49 (Tax 1982) ("Until a sufficient number of samplings have been examined to establish a definite trend from which a reasonable conclusion can be drawn," it is generally not possible to determine the "fair value of" the subject property). Therefore, the 2020 assessment must be affirmed.

The next issue the court has is the lot size adjustment at $25 PSF. The appraiser's report for each tax year noted that the "typical lot" size in Loch Arbour ranges from 7,500 SF-13,000 SF.[10] However, since the Subject's buildable lot size was 12,500 SF (per his testimony), the appraiser considered the balance (5,500 SF) as surplus land, which he valued at $25 PSF. While the court agrees with him that area in excess of the buildable lot size can command a lower PSF value, it disagrees with him that all land in excess of a comparable's lot size is similarly surplusage. This is the effect of his multiplying all land in excess of the comparable's lot size and the Subject's lot size of 18,000 SF by $25 PSF. His computation also assumes that every

---

[10] However, the lot sizes of three of his comparables (408 Euclid Avenue; 10 Evergreen Place; 112 Euclid Avenue) were all less than 7,500 SF, while the lot sizes of two comparables (106 Norwood Ave and 329 Euclid Avenue) were greater than 13,000 SF.

comparable's listed lot size is its buildable lot size. This is illogical because (1) the comparison is between buildable lot-to-buildable lot; (2) his report notes that "[t]he marginal utility of the subject's additional land area has a value that is naturally less than a total building lot"; (3) his reports note that the site size adjustment "also takes into consideration surplus acreage beyond the typical 10,000+ sf lot size, along with any conservation easements, changes in topography and road frontage"; and (4) by his own calculations, the Subject's buildable lot size is worth more. It is doubtful if Plaintiffs would sell the Subject's lot (as vacant) at $50 PSF for up to 6,140 SF (the smallest lot size of a comparable, 112 Euclid Avenue), and then at $25 PSF for the remainder. This would be simply contrary to the HBU analysis since it violates the financially feasible and maximal productivity aspects. See Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 268 (Tax 2013) (HBU "analysis requires sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive") (citation omitted), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

Thus, it is also difficult to agree with the appraiser's conclusion that 214 Euclid Avenue (which measured 15,075 SF and was used to extract the lot size adjustment) "has an additional 7,575 square feet" as compared to 111 Euclid Avenue (the other sale used to extract the adjustment, which measured 7,500 SF), and that "[t]herefore, the additional utility of the additional 7,575 square feet is about 45% less than the smaller lot." This conclusion also asks the court to assume that the buildable lot is always 7,500 SF and any land in excess of this would be surplus. There is no evidence to support this assumption. It could be that the larger lot has a buildable lot size as the Subject (12,500 SF), which then means that only 2,575 SF would be deemed surplus, which then calls into question the validity of allocating 45% of a lot to surplus,

and therefore deeming 45% of $50 PSF (the Subject lot's buildable value opined by the appraiser) to be the value of surplus land. That the "typical" lot size in Loch Arbour is 7,500 SF-13,000 SF does not assist the court since it does not address whether each comparable requires the same buildable lot size as the Subject's under Loch Arbour's zoning ordinance.

Assuming each comparable's minimum buildable lot is similar to the Subject's (12,500 SF per the appraiser's testimony), it would be logical to calculate the adjustment at $50 PSF for up to 12,500 SF, and then a lower amount for the remaining 5,500 SF. This would increase the lot size adjustments in all cases where the comparables' lot sizes are smaller than the Subject's. This would increase the adjustment amount, thus, increase the adjusted sale price. However, the court cannot (1) assume that each comparable's lot has the same buildable lot size as the Subject; or (2) compute the PSF value of the alleged surplus based on the evidence before it. There was no information whether each comparable's zoning and minimum requirements thereunder were the same as the Subject. Additionally, as 329 Euclid Avenue has a lot size of 24,750, the court does not know whether there could be two buildable lots: if so, there would be no surplusage, or whether to assume that the 12,250 SF is all surplus land assuming the buildable lot for this comparable is also 12,500 SF. Since the court cannot assume facts into evidence, see F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 430 (1985) (court can find value based only "on the evidence before it and the data that [is] properly at its disposal"), it cannot compute an adjusted lot size adjustment.

It should be noted that Plaintiffs' appraiser carried his $25 PSF lot size adjustment when computing his location adjustment for the two comparables with a view of Deal Lake, (403 Edgemont Drive and 325 Edgemont Drive) as explained above. The court's disagreement with

the $25 PSF computation then could reduce the <u>amount</u> of the location adjustment for these two comparables.

Since each comparable required a lot size adjustment for each tax year at issue, the court is forced to affirm the assessments due to the issue with the credibility of this adjustment. For tax year 2020, the assessment is affirmed for the additional reason that one comparable is an insufficient sampling. Consequently, there is no need to evaluate the credibility of the need for, or amount of the remaining adjustments.[11]

**CONCLUSION**

For all of the reasons stated above, the court affirms the assessments for each tax year.

Very Truly Yours,

Mala Sundar, J.T.C.

---

[11] The court finds persuasive Plaintiffs' appraiser's adjustment extraction methodology for items such as GLA, basement, and amenities (cost data from M&S as depreciated after applying multipliers). It disagrees with his adjustment for (1) ocean proximity (112 Euclid Avenue) since it was based on comparing the mean PSF unadjusted sale prices. Without the adjustments for other differences (GLA or site size or condition he had done when extracting an adjustment for views of Deal Lake), it is not possible to attribute the sale price difference to ocean proximity only; (2) inground pool (-$25,000 for 106 Norwood Avenue) based on the assessor's undisputed testimony that the property never had an inground pool pre-sale since permits to build one were acquired post-sale in 2016; (3) some of the comparables' allegedly superior condition.